## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

---

MICHAEL TALLON
89 Nottingham Circle,
Jamestown, NY 14701,

      Plaintiff,

v.

UNITED AIRLINES, INC.
233 S. Wacker Drive
Chicago, IL 60606,

AIR LINE PILOTS ASSOCIATION,
INTERNATIONAL
9550 W. Higgins Road
Rosemont, IL 60018,

and

DR. ROBERT NOVEN
111 N. Wabash Ave., Ste. 1116
Chicago, IL 60602

      Defendants.

Case No.:

JURY DEMANDED

---

## COMPLAINT

---

Plaintiff Michael Tallon, by and through his attorneys, Hansen Reynolds LLC, states the following for his Complaint:

### I.      <u>INTRODUCTION</u>

1.     This action arises from a systematic campaign of retaliation, coercion, and abuse United Airlines ("United") and Air Line Pilots Association, International ("ALPA") perpetrated against Michael Tallon ("Plaintiff"), a senior United Airlines Captain, following a workplace head injury in June 2023. Instead of providing the Federal Aviation Administration's ("FAA")

1

mandated treatment protocol for a serious head injury, United and ALPA (collectively the "Defendants") forced Plaintiff into a medically unnecessary substance abuse program. This coercion occurred despite overwhelming evidence that Plaintiff did not meet any diagnostic criteria for alcohol use disorder or substance dependency. Defendants' conduct violated Plaintiff's rights under federal law, including the Wendell H. Ford Aviation and Investment Reform Act for the 21st Century ("AIR21") (49 U.S.C. § 42121)[1], the Americans with Disabilities Act ("ADA") (42 U.S.C. § 12101 et seq.), Section 504 of the Rehabilitation Act (29 U.S.C. § 794), the Employee Retirement Income Security Act ("ERISA") (29 U.S.C. § 1001 et seq.), and Illinois common law.

## II.     JURISDICTION AND VENUE

2.      This Court has jurisdiction under 28 U.S.C. §§ 1331, 1343, and 1367 as the Complaint raises federal questions.

3.      Venue is proper in the Northern District of Illinois pursuant to 28 U.S.C. § 1391(b), as a substantial part of the events giving rise to the claims occurred in this District, Defendant United is headquartered here, and ALPA has a business office in this district.

## III.     PARTIES

4.      Plaintiff is a United States and a New York citizen. He lives at 89 Nottingham Circle, Jamestown, New York 14701.

5.      Defendant United is a commercial airline headquartered in Chicago, Illinois with a principal place of business at 233 S. Wacker Drive, Chicago, IL 60606.

---

[1] Plaintiff's AIR21 whistleblower case is being addressed, as required, by a Department of Labor Administrative Law Judge.

6.     Defendant Air Line Pilots Association, International ("ALPA") is a labor organization representing United pilots, including Plaintiff, and conducts business in this District at 9550 W. Higgins Road, Rosemont, IL 60018.

7.     Defendant Dr. Robert Noven is an Aviation Medical Examiner ("AME"). His principal place of business is 111 N. Wabash Avenue, Suite 1116, Chicago, IL 60602.

## IV.     EEOC CHARGES

8.     Plaintiff filed disability discrimination and retaliation charges with the Equal Employment Opportunity Commission against both United and ALPA. He has received right to sue notices on all his charges. This filing is within 90 days of Plaintiff's receipt of those right to sue notices.

## V.     FACTUAL BACKGROUND

### A.  Tallon Suffers Head Injury.

9.     On June 10, 2023, while serving in his capacity as a Line Check Pilot for United Airlines, Plaintiff Tallon suffered a head injury while on a layover in Ponta Delgada, Azores. He tripped on an uneven cobblestone walk and fell to the ground, sustaining visible facial lacerations and concussion symptoms.

10.     Following the fall, Plaintiff's colleague, Captain Anthony Randazzo, observed Plaintiff's deteriorating speech and confusion. Plaintiff returned to his hotel room to rest, but his head injury worsened. He became concerned that he would not be safe to fly the next day.

11.     Plaintiff telephoned a United manager asking to be removed from flight duty the next day.

12.     The United Manager then called Captain Randazzo who stated that Plaintiff was not intoxicated but might have a concussion.

13.     Despite clear and reported signs of head trauma, the United manager failed to provide or suggest that Plaintiff seek immediate medical attention, at one of the three local English-speaking Emergency Care providers, as required by United's own procedures for crew member injuries while on duty or on layovers.

14.     Plaintiff called his wife, Kristen Tallon. Plaintiff asked her to let him speak with his mother. Mrs. Tallon knew something was wrong, Plaintiff's mother had passed some twenty years earlier. Plaintiff seemed distracted and confused.

15.     Plaintiff also spoke with Margaret Hendrix. Hendrix is the ALPA representative and Chair of United's three person HIMS Steering Committee. As he was with both the United Manager and Mrs. Tallon, Plaintiff was disoriented and confused when he spoke with Hendrix.

16.     According to Hendrix, during Plaintiff's concussed fog, he told her he needed help with his drinking in response to her leading questions on the topic. Plaintiff does not have a complete recollection of this conversation.

**B. Rather than Address Plaintiff's Concussion, United and ALPA Force Tallon to See a Psychiatrist It Controls and Then into a Month-Long In-Patient Rehabilitation Clinic.**

17.     On June 11, 2024, Plaintiff flew home as a passenger on the flight he was originally scheduled to pilot. While he was still in the air, without Plaintiff's knowledge or permission, ALPA representative Hendrix arranged for Plaintiff to attend an in-patient alcohol treatment program.

18.     When Plaintiff landed in the United States, United and ALPA representatives, called him. They immediately pressured him to admit to alcoholism. Plaintiff was shocked. He denied that he had an alcohol issue. Hendrix warned Plaintiff that if he did not confess to having a drinking problem, he would "never fly a United plane again."

19.     Defendants failed to advise Plaintiff that he needed a post-injury neurological workup and MRI. They did not follow the FAA-mandated head injury or unidentified loss of consciousness protocols. Instead, they demanded that Plaintiff immediately attend the in-patient treatment for alcohol dependency that Hendrix had arranged.

20.     On June 14, 2023, his own initiative, Plaintiff scheduled an appointment with his Aviation Medical Examiner ("AME"), Dr. Terrence Moisen, to assess his head injury. However, Defendants were not interested in hearing about head injuries. They wanted Plaintiff in their HIMS program.

21.     When Defendants learned that Plaintiff was going to get a proper medical evaluation, United and ALPA ordered Plaintiff to cancel the appointment. Thus, Plaintiff himself was pursuing the proper course of action for his head injury, but United and ALPA mandated that he not take it.

22.     Instead, ALPA and United coerced Plaintiff into agreeing to a Fitness for Duty Evaluation by United's hand-picked psychiatrist, Dr. Stafford Henry, in exchange for a delay in his mandated in-house psychiatric treatment. On information and belief, Dr. Henry has never received a referral from United where he did not do United's bidding by confirming its suggested diagnosis. While he may not have a written contract with United, he is beholden to it due to the steady flow of work it provides him.

23.     On July 25, 2023, Dr. Henry met with Plaintiff. Despite being a licensed physician who routinely reports to the FAA, Dr. Henry did not evaluate Plaintiff under the FAA's head injury protocol. Instead, Dr. Henry tested Plaintiff for drugs and alcohol for his Fitness for Duty Evaluation. Test results came back clear, including his PEth test, which provided Dr. Henry with a "lookback" at Plaintiff's total alcohol consumption over time. There was no evidence of

alcohol or dependence in the Fitness for Duty Examination. Nonetheless, on August 6, 2023, Dr. Henry released a report stating he believed Plaintiff was alcohol dependent according to CFR criteria.

24.     Between August 6th and August 15th, Plaintiff contacted ALPA attorney John Hanson multiple times to challenge Dr. Henry's report. Plaintiff sought to exercise his Section 14 rights under the United Airlines – ALPA United Pilot Agreement ("UPA") guaranteeing a pilot the right to a second opinion after an unfavorable Fitness for Duty Evaluation. Plaintiff was looking to ALPA to act on his behalf.

25.     ALPA lawyer, John Hanson, then gave Plaintiff disturbing advice. He warned Plaintiff that resisting Dr. Henry's findings would result in being treated harshly. He stated that Plaintiff's exercising his contractual right to a second opinion would insult Dr. Henry and suggest "denial," making it more difficult for Plaintiff to "stay in compliance."

26.     When Plaintiff discussed the possibility of hiring an outside lawyer for a second legal opinion, Hanson warned that doing so would invalidate Plaintiff's ALPA representation, leave Plaintiff unpaid and unrepresented, and could lead to his termination.

27.     To be clear, Dr. Henry did not diagnose Plaintiff under the DSM or FAA standards for alcohol dependence. Instead, he opined Plaintiff might meet FAA criteria for alcohol dependence due to alleged "drinking in larger amounts and over longer periods than intended." That is not the diagnostic standard from any recognized authority. **This opinion ignored** comprehensive lab results, professional evaluations, Plaintiff's clean history and, most importantly, **Plaintiff's yet to be treated head injury. Henry's opinion also failed to apply the very FAA procedures for a psychiatric alcohol evaluation which Henry referenced.**

28.     On August 28, 2023, over Plaintiff's objections, United and ALPA forced Plaintiff to enter an inpatient treatment at High Watch Recovery Center in Connecticut ("High Watch"). On September 5, 2023, a High Watch official sent a note to United EPA stating, "I have read the report from Dr. Henry…I don't see a diagnosis for him based on what he shared." In other words, High Watch read Dr. Henry's report and saw no basis for his so-called diagnosis. Thus, no medically trained person confirmed Henry's nonstandard, unsupported opinion with a true medical diagnosis.

29.     At High Watch, Plaintiff was tested and evaluated for over 28 days. He was subjected to repetitive and intrusive group therapies focused exclusively on alcohol use, abuse, and dependence. None of these were appropriate given Plaintiff's actual medical condition – a head injury.

**C.  United Forbids Tallon to Leave High Watch Until He Signed a HIMS Contract.**

30.     On or about September 21, 2023, ALPA and United representatives, Margaret Hendrix, James Bono, Chicago's Chief Pilot, and Kip Bowen, the head of United's Employee Assistance Program, all traveled to Connecticut to meet with Plaintiff before High Watch discharged him. There, they insisted that Plaintiff sign a Human Intervention Motivation Study ("HIMS") contract to enter the United HIMS program.

31.     Plaintiff challenged the instruction to sign the contract, stating it was not appropriate given that he did not have an alcohol problem, as High Watch later confirmed. Bono and Hendrix then told him that if he did not sign the HIMS contract, he was not leaving High Watch and that he would be fired. Plaintiff pointed out that he had no diagnosis. Hendrix and Bono persisted with their high-pressure tactics.

32.    United's EAP representative, Bowen, told Plaintiff he had two options: leave United or enter the United HIMS program. No third option, including assessment and treatment for a concussion or head injury, was offered.

33.    Under coercion and duress, Plaintiff signed the HIMS contract on September 21, 2023.

34.    United's HIMS contract contains this silly phrase: "Compliance is not arbitrary. It is simply doing what is required by the program." However, nowhere does the contract state that it was signed voluntarily and without duress and coercion as so many other contracts with employees do.

35.    On September 25, 2023, after treating Tallon for a month, High Watch's Dr. Sarah Williamson issued a medical discharge finding of "No Diagnosis." This should have been the end of United's and ALPA's alcohol-related inquiries and suggestions related to Plaintiff. It was not. United did not revoke the HIMS contract. Instead, the Defendants amped up their pressure.

36.    On September 26, 2023, Plaintiff spoke with Bowen. Plaintiff explained that the coercion and intimidation to pretend to be alcoholic, forever talking about "recovery," was not appropriate. Plaintiff explained the exonerating "no diagnosis" finding he had received and that he had nothing to recover from. Plaintiff wanted out of the HIMS contract he had been forced to sign.

37.    An employer cannot condition employment on an employee's admission that he has a disability, but United insisted, nonetheless. Bowen demanded that Plaintiff openly state, "I am in recovery," and warned, "If I hear you say one more time that you are NOT in recovery, you will be out of compliance with the program." Plaintiff understood this as a threat that his pay and benefits would be stopped, leading to potential termination.

38.     United and ALPA regarded Plaintiff as alcohol dependent.

39.     Alcohol dependence is an "impairment" under the ADA.

**D.  United's Discriminatory HIMS Program.**

40.     The FAA does not require United to operate a HIMS program. No FAA regulation, order, guidance document or policy mandates airline-run HIMS programs.

41.     Instead, the FAA requires that a specially trained AME, called a HIMS AME, monitor testing and recovery for a pilot who is diagnosed as alcohol dependent. Thus, by federal law, this is what is necessary to assure pilot compliance with federal regulations.

42.     For substance dependent pilots, the FAA may grant a special issuance medical certificate, which allows pilots who are managing their disease to fly if they comply with an additional set of requirements. These might include visits to a psychiatrist, attendance at aftercare or participation in Alcoholics Anonymous. The most common additional restriction is random testing reportable to the HIMS AME.

43.     In this case, the FAA did not revoke Plaintiff's medical certificate or take any action against Plaintiff based on his fall in the Azores. Only United and ALPA did.

44.     United and ALPA decided years ago that they would go beyond FAA requirements and create their own HIMS programs to deal with substance dependent pilots. These programs appear to have been designed without regard to federal laws like the Americans with Disabilities Act or § 504 of the Rehabilitation Act.

45.     United and ALPA boast that their HIMS program is the "gold standard" of such programs. However, the United and ALPA HIMS program imposes unlawful conditions and limitations on pilots diagnosed—or as in this case merely suspected—of substance use or dependence.

46.     These restrictions include United dictating to the pilot the specific physicians, psychiatrists, psychologists, neuropsychologists, and other treatment professionals he must see. It dictates the 'treatment' and medical tests which the pilot must undergo even if those 'treatments or tests are not supported by a medical diagnosis or are contra-indicated for the pilot's actual medical condition. It also requires:

- total abstention from alcohol and drugs;

- inpatient treatment;

- daily attendance at AA meetings;

- aftercare;

- mandatory check-ins with peer pilots, chief pilots, and EAP;

- twice daily Soberlink breathalyzer tests;

- indefinite therapy;

- personal disclosures in meetings that management also attends; and

- group meetings.

47.     A pilot in the HIMS program at United is not free to select any of the treatment professionals he sees of his alleged dependence. Instead, United picks the professionals one must use. These care providers are financially dependent on United for a significant portion of their business. They frequently act in United's best interest to the detriment of the pilot they are servicing.

48.     If a pilot chooses his own Aviation Medical Examiner, psychiatrist, psychologist, or treatment team, he can be deemed noncompliant with the HIMS program and be fired.

49.     The HIMS program requirements are not tailored to individual medical needs but instead are applied uniformly. The HIMS contract, policy, handbook, and manual are the same

for every employee in the program. Nothing is tailored to individual needs or circumstances. All this violates the ADA's and Rehabilitation Acts mandate of individualized assessment. Every pilot in the HIMS program must follow the same set of requirements.

50.     United's approach is different from FAA requirements which are tailored to the individual. Also, unlike the FAA, United has no process by which to challenge the alcohol dependent designation its hand-selected experts make. Indeed, in this case, Plaintiff did not even get to exercise his contractual right to a second opinion. Also, unlike the FAA the United requirements for a pilot are not based upon any medical diagnosis, finding, or observable medical indicator.

51.     ALPA, more than a passive participant, plays an active and driving role in administering the HIMS program. ALPA personnel, like Margaret Hendrix and John Hanson, coordinate treatment plans, dictate required steps, and serve on oversight committees. As part of their contract with United delegating specific duties for administration of the HIMS program, ALPA requires that no manager can contact or speak to a pilot directly once the pilot has signed the HIMS contract.

52.     United's Pilot Agreement provides long-term disability ("LTD") to pilots who lose their medical certificate. This benefit has no expiration except retirement, death, or termination. By enrolling in HIMS, Plaintiffs lose these benefits because enrollment in the United HIMS program entitles the pilot to only two years' worth of LTD benefits and requires pilots to 'confess' to a medical diagnosis of alcohol dependence despite the fact that no diagnosis was ever made, and was specifically ruled out.

53. In this case, by forcing Plaintiff into a HIMS - based LTD, United and ALPA deprived Plaintiff the benefits he would have received had United classified his LTD as a head injury, a concussion, or an undiagnosed loss of consciousness.

54. Defendants concealed Plaintiff's LTD rights and coerced Plaintiff into signing documents that would waive those protections, in violation of ERISA's anti-interference restrictions and the ADA.

55. Once "the HIMS process" starts, there appears to be no way out. Substance abuse experts often disagree with United's diagnosis, but it does not matter. Once you are in, you are in for good.

56. Indeed, both United and ALPA told Tallon, "There is no way out. Once you have agreed to HIMS, you cannot back out."

**E. Tallon Complies with HIMS.**

57. When Plaintiff entered the HIMS program, he tried to comply.

58. Between September 26, 2023, and December 25, 2023, Plaintiff completed ninety consecutive days of an intensive outpatient program. Each session was three hours in length, facilitated by therapist/moderator Matt Ahlberg, LCSW. At the conclusion of the program, Ahlberg confirmed – Plaintiff was not alcoholic. He stated: "After working with Mike since his admission, he doesn't meet the criteria for alcohol use disorder."

59. During this time, Plaintiff also completed ninety consecutive days of AA attendance.

60. Plaintiff obtained an AA sponsor. He agreed that Plaintiff was not alcoholic. Plaintiff provided his sponsor's contact information to United's EAP, but on information and belief, EAP never called him.

61.     In early 2024, Plaintiff began an aftercare program at High Flight Aftercare led by Timothy J. Gaither. He is a licensed professional counselor that United chose for Plaintiff. Gaither confirmed that Plaintiff was not an alcoholic stating:

> "Based on my personal weekly observations/interactions of Michael for over five months and a lack of a drinking history or a history of unmanageability, **I do not believe he meets the DSM V diagnostic criteria for AUD or the DSM IV diagnostic criteria for Alcohol Dependence.** My recommendation is that Michael receive a second opinion from a psychiatrist…"

62.     Despite Gaither's opinion, Plaintiff continues with weekly aftercare.

63.     Plaintiff also attended monthly HIMS meetings, peer pilot, chief pilot, and EAP check-ins, and blew into a Soberlink breathalyzer twice a day. No issues arose in the meetings or tests.

**F.  Professionals Consistently Conclude Tallon Does Not Have a Drinking Problem.**

64.     On October 2, 2023, one week after his release from High Watch, Plaintiff saw Dr. Robert J. Bailey, his Primary Care Physician. It was the first time Plaintiff had been examined by a real medical doctor since his fall. Dr. Bailey was shocked that Plaintiff had not yet received a trauma evaluation for his workplace injury.

65.     Dr. Bailey explained to Plaintiff how fortunate he was to have avoided post-injury complications from the pressurized flight home. He ordered an MRI exam and discussed the need for a neurological evaluation after all the symptoms had resolved – typically 10-12 months after injury – since it was too late to do the optimal post-injury neurological eval.

66.     After careful review of the records, Dr. Bailey noted, **"[I]t appears [neither] patient nor his psychiatrist feel that patient has alcohol use disorder. I do agree with this statement. Patient is medically cleared to return to work with no restrictions from my perspective."**

13

67.     Plaintiff shared Dr. Bailey's assessment with United. It did not care. It did not allow Plaintiff out of the HIMS program.

68.     In November 2023, United assigned Defendant Dr. Robert Noven to be Plaintiff's HIMS Air Medical Examiner.

69.      On December 19, 2023, Plaintiff met with Dr. Noven. He reviewed his medical records with Dr. Noven including High Watch records stating, "No diagnosis," Bailey's records, intensive outpatient program records, aftercare, and AA reports – all showing no alcohol dependence.

70.     Plaintiff explained to Dr. Noven he was not alcoholic. Rather than reaching out to FAA to state a mistake had been made, Dr. Noven, at United's behest, ordered Plaintiff to undergo neuropsychological testing from Dr. Maya Yutsis.

71.     In January 2024, **Dr. Yutsis met with Plaintiff and informed him there was no basis for neuropsychological testing in the absence of a diagnosis.**

72.     When Dr. Yutsis read Plaintiff's medical chart, she raised a red flag. "This is strange," she commented, "there is no diagnosis here. **You have not been diagnosed with anything.**"  Plaintiff then explained what he had been telling everyone – he was never an alcoholic, had never abused alcohol, every test and every MD confirmed it. He explained about his fall and his own doctor's diagnosis of a head injury.

73.     Despite her review of his charts, noting the injury and the lack of appropriate medical care and the complete lack of alcohol diagnosis – she shrugged it off, with the comment "Well, 'they' sent you here, we might as well do the testing anyway."

74.     Dr. Yutsis then proceeded to administer the six-hour FAA neurocognitive test.

75.     During the course of the six hour test, Dr. Yutsis again mentioned to Plaintiff that his case was different because he did not meet the criteria for alcohol dependency and stated "it's a shame you have to take this risk, since a bad score can threaten your medical certificate, when there is not any diagnosis requiring your taking the test."

76.     Upon learning for the first time that he was subjecting himself to unnecessary tests which could risk his medical certificate, Plaintiff and Dr. Yutsis agreed to discontinue the testing.

77.     On February 5, 2024, Plaintiff once again saw Dr. Noven. Plaintiff asked Dr. Noven why he sent him to Dr. Yutsis, as neuropsychological testing was not warranted or medically appropriate. Dr. Noven sent Plaintiff home.

78.     On February 8, 2024, United, through Dr. Noven, mandated that Plaintiff see a psychologist for treatment of "anxiety and denial of (alleged) "alcoholism." He did. He went to United's hand-picked psychologist, Eric Braun, a qualified Substance Abuse Professional ("SAP")and [list all of Braun's impressive list of licenses and credentials her.]

79.     Plaintiff attended a 14-session DOT-compliant Substance Abuse Evaluation ("SAE") sessions with Braun. On April 11, 2024, Mr. Braun wrote:

> "…information reflecting the extensive collateral sources and interview I have pursued from past treatment facilities, family, friends, colleagues from the airline industry and Mr. Tallon's AA (Alcoholics' Anonymous) Sponsor indicated exemplary compliance with all expectations of all relevant familial, social, treatment and job-related roles. **All such sources were consistent that Mr. Tallon did not have a drinking problem** despite their being pressed by me as to describe the variety of settings that they encountered Mr. Tallon in, how many times, and to describe his behavior in those environments to me in detail."

80.     On April 22, 2024, the day *after* receiving Braun's report which showed Plaintiff did not meet DSM or CFR or DOT SAE criteria for any alcoholic disorder, nor "anxiety" nor "denial", Jen Wegener called Plaintiff and told him that United wanted him to reschedule the

neurocognitive test with Dr. Yutsis. Plaintiff objected. He had sent reams of information to United confirming that he was not alcoholic and was finished with the nonsense.

81.     Following the Braun evaluation, United retaliated against Braun because he did not give it the diagnosis for which it was looking.

82.     Dr. Robert Noven, United's HIMS AME, personally called and threatened Braun. He insisted that Braun change the diagnosis. According to Braun, on the afternoon of April 25, 2024, Dr. Noven phoned him and identified himself as a "United Airlines Psychologist." He stated he wanted to discuss Braun's report about Plaintiff. Dr. Noven vehemently disputed Braun's findings. He verbally criticized Braun's testing and methods. Dr. Noven told Braun that his report was only supposed to validate Dr. Henry's previous diagnosis of alcohol dependence and to treat Plaintiff's "denial and anxiety."

83.     When Braun refused to change his report, United fired him as Plaintiff's psychologist.

84.     This act led to formal complaints against Dr. Noven with the Illinois Department of Financial and Professional Regulation and to the FAA.

85.     On April 19, 2024, Dr. Robert J. Bailey, Plaintiff's doctor wrote:

"During my tenure of his healthcare, I have never treated Michael for any alcohol use disorders. Furthermore, upon reviewing all medical records made available to all to me from the High Watch Recovery Center, **I find no evidence of any medical indication of an alcohol use disorder. There is also no clinical evidence to suggest having him have any further testing related to alcohol use disorder.**

**Given the absence of any objective indications, I do not recommend any additional referrals regarding alcohol use disorder.** Additionally, there is no medical basis for further neurocognitive assessments in Mr. Tallon's case."

86.     On May 8, 2024, Dr. Bailey completed Plaintiff's annual physical, blood workup and tests. He, once again, confirmed that Tallon had no alcohol use or dependence.

16

87. On May 17, 2024, Plaintiff complained – again – to United about it regarding him as alcoholic when the consistent medical evidence showed he was not.

88. On June 5, 2024, Dr. Noven resigned as Plaintiff's HIMS AME. He then retaliated against Plaintiff by writing a secret note to the FAA suggesting Plaintiff is alcoholic and belonged in the HIMS program – conditions which would cancel his medical.

89. On June 11, 2024, the ORD Base Monitoring Committee demanded that Plaintiff complete his neuropsychology behavior testing with Dr. Yutsis. In a letter, it suggested that the FAA required such testing. This was a lie. The FAA had not dubbed Plaintiff as substance dependent. Plaintiff refused to submit to further unnecessary and now retaliatory testing.

90. On June 21, 2025, Tallon filed a complaint with United objecting to its orders that he receive unnecessary medical testing. Later that day, Plaintiff received a letter from the BAC recommending he be removed from the HIMS program.

91. On July 8, 2024, Plaintiff was officially removed from HIMS.

92. On November 22, 2024, United issued a Letter of Charge charging Plaintiff for failing to comply with the United HIMS program.

93. On December 19, 2024, United held a formal Letter of Charge hearing grounded on the false alcohol narrative and Plaintiff's alleged refusal to cooperate with HIMS, despite possessing conclusive evidence of Plaintiff's medical innocence.

94. After a hearing, in February, 2025, United fired Plaintiff because he allegedly would not comply with the HIMS program.

## CLAIMS FOR RELIEF

### COUNT I
### VIOLATION OF THE ADA (42 U.S.C. § 12101 et seq.) (Discrimination)
### (Against United and ALPA)

95. Plaintiff incorporates the foregoing paragraphs as if fully restated herein.

96. The ADA prohibits discrimination against individuals who are "regarded as" disabled.

97. United and ALPA regarded Plaintiff as alcohol dependent.

98. United and ALPA regarded Plaintiff as an alcohol abuser.

99. Dr. Henry's 'diagnosis' as alcohol dependent does not fall within the DSM 4 or 5 criteria.

100. Dr. Henry's 'diagnosis' of alcohol dependent, which is actually an opinion about regulatory scope, does not fall within one of the four FAR requirements for withholding a medical certificate from a pilot.

101. United and ALPA imposed treatments, testing, and monitoring requirements on Plaintiff based in part on their perception that Plaintiff is alcohol dependent.

102. Such actions violate the ADA's prohibition on discrimination against individuals regarded as having a disability, especially when based on false or unverified assumptions.

103. United and ALPA's actions also violated Plaintiff by failing to provide reasonable accommodations for his actual, documented concussion, instead imposing punitive measures for a condition he did not have.

104. These actions, when viewed in their totality, constitute systemic violations of federal law, medical ethics, and Plaintiff's fundamental rights as an employee and as a person with a perceived and actual medical condition.

105.    Defendants failed to provide reasonable accommodations for Plaintiff's actual condition—post-concussion syndrome—while simultaneously subjecting him to burdensome and discriminatory treatment requirements for a condition he did not have.

106.    Defendants' conduct constitutes discrimination under the ADA.

107.    Plaintiff suffered damages due to Defendants' conduct.

**COUNT II**
**VIOLATION OF THE ADA (42 U.S.C. § 12101 et seq.) (Retaliation)**
**(Against United and ALPA)**

108.    Plaintiff incorporates the foregoing paragraphs as if fully restated herein.

109.    Defendants fired Plaintiff because he complained about unnecessary medical treatment and tests and United and ALPA's wrongful perceptions of him.

110.    Plaintiff suffered damages due to Defendants' conduct.

**COUNT III**
**VIOLATION OF THE REHABILITATION ACT (29 U.S.C. § 701 et seq.)**
**(Against ALPA)**

111.    Plaintiff incorporates the foregoing paragraphs as if fully restated herein.

112.    ALPA receives federal financial assistance for its work with HIMS programs. It is subject to the Rehabilitation Act.

113.    ALPA engaged in and facilitated discrimination against Plaintiff based on a perceived disability, denying him rights and benefits provided to similarly situated employees.

114.    ALPA also failed to ensure that Plaintiff's medical care and employment rights were protected under applicable federal law in retaliation for Plaintiff's resistance to the HIMS program.

115.    Plaintiff suffered damages due to ALPA's conduct.

## COUNT IV
## INTERFERENCE WITH ERISA-PROTECTED LTD BENEFITS
### (Against United and ALPA)

116.    Plaintiff incorporates the foregoing paragraphs as if fully restated herein.

117.    Following his head injury, Plaintiff was entitled to long-term disability benefits under an ERISA-covered plan.

118.    Defendants interfered with those rights by coercing Plaintiff to waive benefits, providing misinformation, and directing false diagnoses reporting to influence LTD eligibility determinations.

119.    A United Airline representative instructed Plaintiff to put false information on his LTD application with the intent of denying him the full LTD benefits he would have received if he had listed his head injury as the reason for his inability to work.

120.    Had Defendants recognized Plaintiff's actual medical problem, a likely concussion, Plaintiff could have been immediately invoked in United's LTD and been receiving its benefits.

121.    Defendants' unlawful termination resulted in Plaintiff being denied ongoing LTD benefits.

## COUNT V
## FRAUD AND CONSPIRACY TO DEFRAUD
### (Against United ALPA and Dr. Noven)

122.    Plaintiff incorporates the foregoing paragraphs as if fully restated herein.

123.    Defendants knowingly submitted false records and insurance claims to Aetna and FAA, describing Plaintiff as alcohol dependent when overwhelming medical evidence showed otherwise.

124.    The FAA relied on these representations to Plaintiff's detriment, resulting in loss of income, benefits, and professional standing.

125.    Dr. Noven, through back channels at the FAA charged Plaintiff with alcohol dependence despite all evidence to the contrary.

126.    The Defendants' actions caused Plaintiff harm.

**COUNT VI**
**INTENTIONAL INTERFERENCE WITH BUSINESS RELATIONSHIP**
**(Against Dr. Noven)**

127.    Plaintiff incorporates the foregoing paragraphs as if fully restated herein.

128.    Dr. Noven, through back channels at the FAA charged Plaintiff with alcohol dependence despite all evidence to the contrary.

129.    The day after Dr. Noven's FAA report, the FAA reached out to Plaintiff to say his previously unrestricted medical certificate was under review. Dr. Noven interfered with Plaintiff's relationship with his employer and the government licensing agency upon which his certification and licenses depend. This caused Plaintiff damages.

**<u>PRAYER FOR RELIEF</u>**

WHEREFORE, Plaintiff respectfully requests that this Court:

A.  Enter judgment in favor of Plaintiff and against Defendants on all counts;

B.  Award compensatory damages for lost wages, emotional distress, reputational harm, and benefits;

C.  Award punitive damages where permitted;

D.  Issue injunctive relief requiring United Airlines to abandon its HIMS program and create a new one which complies with the law;

E.  Award attorneys' fees and costs pursuant to applicable federal statutes;

F.   Grant such further relief as the Court deems just and proper.

## **JURY DEMAND**

Plaintiff demands a trial by jury on all triable issues.

Dated on this 3rd day of July 2025.

**HANSEN REYNOLDS LLC**

By: /s/ Michael C. Lueder
    Michael C. Lueder
    301 N. Broadway, Suite 400
    Milwaukee, Wisconsin 53202
    (414) 455-7676 (phone)
    (414) 273-8476 (fax)
    mlueder@hansenreynolds.com

*Attorney for Plaintiff*