**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

MICHAEL TALLON
89 Nottingham Circle,
Jamestown, NY 14701,

      Plaintiff,                              Case No.: 2025-CV-07529

v.                                        JURY DEMANDED

UNITED AIRLINES, INC.
233 S. Wacker Drive
Chicago, IL 60606,

AIR LINE PILOTS ASSOCIATION,
INTERNATIONAL
9550 W. Higgins Road
Rosemont, IL 60018,

DR. ROBERT NOVEN
111 N. Wabash Ave. Suite 116
Chicago, IL 60602,

and

DR. STAFFORD HENRY,
105 W. Madison St., Suite 1106
Chicago, IL 60602,

      Defendants.

---

**AMENDED COMPLAINT**

---

    Plaintiff Michael Tallon, by and through his attorneys, Hansen Reynolds LLC, states the following for his Amended Complaint:

## I.    <u>INTRODUCTION</u>

    1.    This action arises from a systematic campaign of retaliation, coercion, and abuse United Airlines ("United") and Air Line Pilots Association, International ("ALPA") perpetrated

against Michael Tallon ("Plaintiff"), a senior United Airlines Captain, following a workplace head injury in June 2023. Instead of providing Plaintiff emergency medical care and allowing Plaintiff to receive the appropriate, Federal Aviation Administration's ("FAA") mandated medical treatment protocol for a serious head injury, United and ALPA (collectively the "Defendants") forced Plaintiff into their medically unnecessary proprietary substance abuse program operated by their employees and agents . This coercion occurred despite overwhelming evidence that Plaintiff did not meet any diagnostic criteria for alcohol use disorder or substance dependency.

2.      Defendants' conduct violated Plaintiff's rights under federal law, including the Wendell H. Ford Aviation and Investment Reform Act for the 21st Century ("AIR21") (49 U.S.C. § 42121)[1], the Americans with Disabilities Act ("ADA") (42 U.S.C. § 12101 et seq.), Section 504 of the Rehabilitation Act (29 U.S.C. § 794), the Employee Retirement Income Security Act ("ERISA") (29 U.S.C. § 1001 et seq.), the Racketeering Influenced and Corrupt Organization Act ("RICO")(18 U.S.C. § 1622 et seq.), and Illinois common law.

## II.      JURISDICTION AND VENUE

3.      This Court has jurisdiction under 28 U.S.C. §§ 1331, 1343, and 1367 as the Complaint raises federal questions.

4.      Venue is proper in the Northern District of Illinois pursuant to 28 U.S.C. § 1391(b), as a substantial part of the events giving rise to the claims occurred in this District, Defendant United is headquartered here, and ALPA has a business office in this district.

---

[1] Plaintiff's AIR21 whistleblower case is being addressed, as required, by a Department of Labor Administrative Law Judge.

### III.     PARTIES

5.      Plaintiff is a United States and a New York citizen. He lives at 89 Nottingham Circle, Jamestown, New York 14701.

6.      Defendant United is a commercial Part 121 Scheduled Airline headquartered in Chicago, Illinois with a principal place of business at 233 S. Wacker Drive, Chicago, IL 60606.

7.      Defendant Air Line Pilots Association, International ("ALPA") is a labor organization representing United pilots, including Plaintiff, and conducts business in this District at 9550 W. Higgins Road, Rosemont, IL 60018.  ALPA also contracts with the Federal Aviation Administration to administer HIMS programs nationwide.

8.      Defendant Dr. Robert Noven is medical doctor, licensed in Illinois, an and an FAA designated Aviation Medical Examiner ("AME"). His principal place of business is 111 N. Wabash Avenue, Suite 1116, Chicago, IL 60602.

9.      Defendant Dr. Stafford Henry is a psychiatrist.  His principal place of business is 105 W. Madison St., Suite 1106, Chicago, IL 60602.

### IV.     EEOC CHARGES

10.      Plaintiff filed disability discrimination and retaliation charges with the Equal Employment Opportunity Commission against both United and ALPA. He has received right to sue notices on all his charges. This filing is within 90 days of Plaintiff's receipt of those right to sue notices.

### V.     FACTUAL BACKGROUND

**A.  Tallon Suffers Head Injury.**

11.      Prior to June 10, 2023, Captain Michael Tallon was a model United Captain. There were no complaints about his work. Colleagues were happy to fly with him. Captain

Tallon was a pilot's pilot. He served as a Line Check on the Boeing 737 and was promoted to QCL (Quality Control Line Check Airman) United counted on Captain Tallon to evaluate the skills and decision making of other pilots. United gave Captain Tallon the responsibility to maintain its high standards for safety and competence among its pilots.

12.     On June 10, 2023, while serving in his capacity as a Line Check Pilot for United Airlines, Plaintiff Tallon suffered a head injury while on a layover in Ponta Delgada, Azores. He tripped on an uneven walk and fell headfirst onto the pavement, sustaining visible facial lacerations and concussion symptoms.

13.     Following the fall, Plaintiff's colleague, Captain Anthony Randazzo, observed Plaintiff's deteriorating speech and confusion. Plaintiff returned to his hotel room to rest, but his head injury worsened. He became concerned that he would not be safe to fly the next day.

14.     Plaintiff telephoned a United manager asking to be removed from flight duty the next day.

15.     The United Manager then called Captain Randazzo who stated that Plaintiff was not intoxicated but appeared to have a concussion, basing his observations on personal experience with sports injuries.

16.     Despite clear and reported signs of head trauma, the United manager failed to provide or suggest that Plaintiff seek immediate medical attention at one of the three local English-speaking Emergency Care providers, as required by United's own procedures for crew member injuries while on duty or on layovers.

17.     Plaintiff called his wife, Kristen Tallon. Plaintiff asked her to let him speak with his mother. Mrs. Tallon knew something was wrong because Plaintiff's mother had passed away

some twenty years earlier. Plaintiff seemed distracted and confused. She became so alarmed she called 911 and asked for help.

18.     Plaintiff also spoke with Margaret Hendrix. Hendrix is the ALPA Chair for the HIMS Committee for the pilots at United Airlines and an agent of ALPA. As he was with both the United Manager and Mrs. Tallon, Plaintiff was disoriented and confused when he spoke with Hendrix as a result of his concussion.

19.     According to Hendrix, during Plaintiff's concussed fog, he told her he needed help with his drinking in response to her leading questions on the topic. Plaintiff does not have a complete recollection of this conversation.

**B. Rather than Address Plaintiff's Concussion, United and ALPA Prevent Tallon from Obtaining Immediate Care and Force Tallon to See a Psychiatrist they Control and Then into a Month-Long In-Patient Rehabilitation Clinic.**

20.     On June 11, 2023, Plaintiff flew home as a passenger on the flight he was originally scheduled to pilot. While he was still in the air, without Plaintiff's knowledge or permission, ALPA representative Hendrix arranged for Plaintiff to attend an in-patient alcohol treatment program.

21.     When Plaintiff landed in the United States, United and ALPA representatives, called him. They immediately pressured him to admit to alcoholism. Plaintiff was shocked. He denied that he had an alcohol issue. Hendrix warned Plaintiff that if he did not confess to having a drinking problem, he would "never fly a United plane again." (Predicate Act)

22.     When Tallon returned stateside, Defendants failed to provide any medical care for his on-duty injury, to initiate a workmen's comp claim or to otherwise follow mandated safety protocols. They failed to provide immediate care for his injury or allow him to be seen at the medical clinic which they maintain at the airport for their employees.  Defendants failed to

advise Tallon that he needed a post-injury neurological workup and MRI. They did not follow the FAA-mandated head injury or unidentified loss of consciousness protocols. Instead, they demanded that Tallon immediately attend the in-patient treatment for alcohol dependency that Hendrix had arranged.

23.     Tallon's medical certificate was up for renewal at the end of June. Tallon had a scheduled appointment with his Aviation Medical Examiner ("AME"), Dr. Terrence Moisan, within days of his return from the Azores. At that appointment Dr. Moisan would assess Tallon's head injury and would have immediately started on the mandated FAA head injury treatment protocols the FAA's Guide for Aviation Medical Examiners requires. When Defendants learned that Tallon was going to get a proper medical evaluation, United and ALPA ordered Tallon to cancel the appointment.

24.     Instead, ALPA and United coerced Tallon into agreeing to a Fitness for Duty Evaluation by United's hand-picked psychiatrist, Dr. Stafford Henry, under threat of termination if he did not comply. As best we know, Dr. Henry has never received a referral from United where he did not follow United's direction and confirm the diagnosis which United managers (with no medical licenses) requested. In many cases, there are false diagnoses which are inconsistent with the medical evidence and diagnostic protocol. (Predicate Acts) While Dr. Henry may not have a written contract with United, he is beholden to it due to the steady flow of work it provides him.

25.     On July 25, 2023, Dr. Henry met with Plaintiff. Despite being a licensed physician who routinely reports to the FAA, Dr. Henry did not evaluate Plaintiff under the FAA's head injury protocol, or in fact the FAA HIMS psychiatric standard or DOT mandated standard for evaluating pilots suspected of alcohol misuse. . Neither did he take any steps to meet his

ethical and legal duty to send Tallon to a qualified doctor to immediately assess his head injury. Instead, Dr. Henry tested Plaintiff for drugs and alcohol for his Fitness for Duty Evaluation. Test results came back clear, including his PEth test, which provided Dr. Henry with a "lookback" at Plaintiff's total alcohol consumption over time. There was no evidence of alcohol or dependence in the Fitness for Duty Examination. Nonetheless, on August 6, 2023, Dr. Henry released a false report stating Plaintiff was likely alcohol dependent according to CFR criteria. (Predicate Act)

26.     Between August 6th and August 15th, Plaintiff contacted ALPA attorney John Hanson multiple times to challenge Dr. Henry's report. Plaintiff sought to exercise his Section 14 rights under the United Airlines – ALPA United Pilot Agreement ("UPA") guaranteeing a pilot the right to a second opinion after an unfavorable Fitness for Duty Evaluation. Plaintiff was looking to ALPA to take action on his behalf.

27.     ALPA lawyer, John Hanson, then gave Plaintiff disturbing advice, knowing that Plaintiff had (a) contacted him for legal advice concerning his employment by United and FAA medical, and (b) knowing that Plaintiff believed Hanson represented Plaintiff. At no time did Hanson give Plaintiff any caution or reason to believe that Hanson did not represent his interests, or did represent another party – ALPA – with an interest adverse to Plaintiff. Hanson warned Plaintiff that resisting Dr. Henry's findings would result in being treated harshly. He stated that Plaintiff's exercising his contractual right to a second opinion would insult Dr. Henry and suggest "denial," making it more difficult for Plaintiff to "stay in compliance." (Predicate Act)

28.     When Plaintiff discussed the possibility of hiring an outside lawyer for a second legal opinion, Hanson warned that doing so would invalidate Plaintiff's ALPA representation, leave Plaintiff unpaid and unrepresented, and could lead to his termination. (Predicate Act)

29.     To be clear, Dr. Henry did not diagnose Plaintiff under the DSM or FAA standards for alcohol dependence. Instead, he opined Plaintiff might meet FAA criteria for alcohol dependence due to alleged "drinking in larger amounts and over longer periods than intended." That is not the diagnostics standard from <u>any</u> recognized authority. **This opinion ignored** comprehensive lab results, professional evaluations, Plaintiff's clean history and, most importantly, **Plaintiff's yet to be treated head injury. Henry's opinion also failed to apply the very FAA procedures for a psychiatric alcohol evaluation which Henry referenced.** Dr. Henry's conduct was part of an on-going, years long pattern of Dr. Henry validating whatever diagnosis United's EAP suggested was appropriate. (Predicate Act).

30.     On August 28, 2023, over Plaintiff's objections, United and ALPA forced Plaintiff to enter an inpatient treatment at High Watch Recovery Center in Connecticut ("High Watch") by showing Henry's report to Plaintiff and mischaracterizing the report as proof that a medical doctor had diagnosed Plaintiff with alcohol dependence – triggering FAR criteria for revocation of his First Class Medical Certificate. (Predicate Act). Neither United nor ALPA shared Henry's report with Highwatch, the FAA or any other medical doctor – who would immediately recognize that it contained no medical diagnosis.

31.     . After Mrs. Tallon shared the Henry report with High Watch, they contacted United. On September 5, 2023, a High Watch official sent a note to United EAP stating, "I have read the report from Dr. Henry…I don't see a diagnosis for him based on what he shared." In other words, High Watch read Dr. Henry's report and saw no basis for his so-called diagnosis. Thus, no medically trained person confirmed Henry's nonstandard, unsupported opinion with a true medical diagnosis[2].

---

[2] By that time High Watch had also conducted a series of blood and urine tests, all of which confirmed Plaintiff's lack of alcohol or drug use.

32.     Instead, Jen Wegener demanded that High Watch keep Tallon in custody, claiming she believed Tallon drank more than he was reporting, despite having never met Tallon.

33.     At High Watch, Plaintiff was tested and evaluated for over 28 days. He was subjected to repetitive and intrusive group therapies focused exclusively on alcohol use, abuse and dependence. None of these were appropriate given Plaintiff's actual medical condition – a head injury.

**C.  United Forbids Tallon to Leave High Watch Until He Signed a HIMS Contract.**

34.     On or about September 21, 2023, ALPA and United representatives, Margaret Hendrix, ALPA representative to HIMS Steering Committee, James Bono, Chicago's Chief Pilot, and Jen Wegener, of United's ORD Employee Assistance Program, all traveled to Connecticut to meet with Plaintiff before High Watch discharged him. There, they insisted that Plaintiff sign a Human Intervention Motivation Study ("HIMS") contract to enter into the United HIMS program.  (Predicate Act)

35.     Plaintiff challenged the instruction to sign the contract, stating it was not appropriate given that he did not have an alcohol problem, as High Watch later confirmed. Bono and Hendrix then told him that if he did not sign the HIMS contract, he was not leaving High Watch and that he would be fired. (Predicate Act). Plaintiff pointed out that he had no diagnosis. Hendrix and Bono persisted with their high-pressure tactics.

36.     United's EAP representative, Jen Wegener, told Plaintiff he had two options: leave United or enter the United HIMS program. (Predicate Act) No third option, including assessment and treatment for a concussion or head injury, was offered.

37.     Under coercion and duress, Plaintiff signed the HIMS contract on September 21, 2023.

38.     United's HIMS contract contains this odd phrase: "Compliance is not arbitrary. It is simply doing what is required by the program." However, nowhere does the contract state that it was signed voluntarily and without duress and coercion as so many other contracts with employees do. Nor does the contract state all the conditions comprising the 'compliance' requirement. Neither does it have a place for United to sign, nor offer any consideration for the pilot's consent.

39.     On September 25, 2023, after treating Tallon for a month, High Watch's Dr. Sarah Williamson issued a medical discharge finding of "No Diagnosis." This agreed with her earlier assessment of "does not appear to meet criteria for an alcohol use disorder." It also was consistent with Dr. Joseph Flynn's statement, "He does not appear to meet criteria for an alcohol use disorder." And Dana Pollack's, the Clinical Supervisor, who wrote, "I have spoken with Jen his EAP caseworker. She was made aware of his progress and the inability to make a diagnosis of alcohol dependence."

40.     Following Plaintiff's release from High Watch, United or ALPA (to be determined in discovery) falsified an insurance claim form to state Plaintiff suffered withdrawal symptoms in his initial days at High Watch. This falsification in the *billing* records directly contradicted the actual notes by the doctors, nurses and providers in the *medical* records for the same dates. (Predicate Act)

41.     This should have been the end of United's and ALPA's alcohol-related inquiries and suggestions related to Tallon. It was not. Tallon showed Dr. Williamson's "no diagnosis" finding Bono. United did not revoke the HIMS contract. Instead, the Defendants amped up their pressure. Bono said comply or be fired. (Predicate Act)

42.     On September 26, 2023, Tallon spoke with Kip Bowen. Tallon explained that the coercion and intimidation to pretend to be alcoholic, forever talking about "recovery," was not appropriate. Tallon explained the exonerating "no diagnosis" finding he had received, which confirmed all the test results, and that he had nothing from which to recover. He asked Bowen, "I am in Recovery from What? I have not been diagnosed with anything" Bowen's response was, "I don't ever want to hear you say that again. You will never get your medical back if you keep denying your situation."  (Predicate Act)

43.     While an employer cannot condition employment on an employee's admission that he has a disability, Bowen demanded that Plaintiff openly state, "I am in recovery," and warned, "If I hear you say one more time that you are NOT in recovery, you will be out of compliance with the program." Plaintiff understood this as a threat that his pay and benefits would be stopped, leading to potential termination. (Predicate Act)

44.     United and ALPA regarded Plaintiff as alcohol dependent.

45.     Alcohol dependence is an "impairment" under the ADA.

46.     Plaintiff had an actual head injury, later determined to be a concussion.  A head injury is an "impairment" under the ADA.

**D.  United's Discriminatory HIMS Program.**

47.     The FAA does not require United to operate a HIMS program. No FAA regulation, order, guidance document or policy mandates airline-run HIMS programs.

48.     Instead, the FAA requires that a specially trained AME, called a HIMS AME, monitor testing and recovery for a pilot who is diagnosed as alcohol dependent. Thus, by federal law, this is what is necessary to assure pilot compliance with federal regulations.

49.     For substance dependent pilots, the FAA may grant a special issuance medical certificate which allows pilots who are managing their disease to fly if they comply with an additional set of requirements. This certificate is issued pursuant to a special issuance letter. These might include visits to a psychiatrist, attendance at aftercare or participation in Alcoholics Anonymous. The most common additional restriction is random testing reportable to the HIMS AME.

50.     In this case, the FAA did not revoke Plaintiff's medical certificate or take any action against Plaintiff based on his fall in the Azores. Only United, ALPA, Dr. Stafford Henry and Dr. Robert Noven did. United called the FAA and asked that a hold be placed on Tallon's medical certificate insinuating that he was an alcoholic *three weeks before he saw Henry* and before he had seen any doctor. (Predicate Act) Separately, Tallon allowed his medical certificate to lapse while he and his AME followed the FAA's head trauma protocols.

51.     After Tallon was released from High Watch, he was ordered to meet United HIMS requirements.

52.     United and ALPA decided years ago that they would not follow  FAA or DOT requirements for alcoholic-diagnosed pilots, but create their own HIMS programs to deal with substance-depending pilots; pilots who were diagnosed with one-time alcohol abuse; pilots for whom there was a one-time concern about potential alcohol use (including as little probable cause as a call from an angry ex- or current spouse or paramour); pilots who were ever arrested in domestic disputes, or pilots whom the program managers claimed had 'asked for help'.  These programs, which mandate the pilot purchase an extensive package of medical and counseling 'services' from specific providers chosen by United – for years – throughout the rest of the

pilot's career, appear to have been designed without regard to federal laws like the Americans with Disabilities Act or § 504 of the Rehabilitation Act.

53.     United and ALPA boast that their HIMS program is the "gold standard" of such programs without explaining which 'gold standard' they are referencing. It certainly is not the 'gold standard' of any recognized medical authority on the treatment of alcohol or substance dependence. However, the United and ALPA HIMS program imposes unlawful conditions and limitations on pilots diagnosed—or as in his case merely suspected—of substance use or dependence.

54.     These restrictions include United dictating to the pilot specific physicians, psychiatrists, psychologists, neuropsychologists and other treatment professionals he must see. It dictates the 'treatment' and medical tests which the pilot must undergo even if those 'treatments' or 'tests' are not supported by a medical diagnosis or are contra-indicated for the pilot's actual medical condition. It also requires:

- total abstention from alcohol and drugs;

- inpatient treatment;

- daily attendance at AA meetings;

- aftercare;

- mandatory check-ins with peer pilots, chief pilots and EAP;

- twice daily Soberlink breathalyzer tests;

- indefinite therapy with United-chosen therapists reporting to United;

- personal disclosures in meetings that management also attends; and

- group meetings.

13

- contact with family members, associates, colleagues, neighbors and disclosure and discussion of intimate personal details with those persons

55. A pilot in the HIMS program at United is not free to select any of the treatment professionals he sees because of his alleged dependence. Instead, United picks the professionals one must use. These care providers are financially dependent on United for a significant portion of their business. They frequently act in United's best interest to the detriment of the pilot they are servicing.

56. A key factor in the United HIMS program is the requirement that all pilots must 'confess' to a medical diagnosis of alcohol dependence – even if there is no medical diagnosis or inidica for a medical diagnosis, as a requirement for Dr. Noven and Dr. Henry to pronounce them "cured"' enough to recommend issuance of a medical from the FAA.

57. If a pilot chooses his own Aviation Medical Examiner, psychiatrist, psychologist or treatment team, he can be deemed noncompliant with the HIMS program and be fired.

58. The HIMS program requirements are not tailored to individual medical needs but instead are applied uniformly. The HIMS contract, policy, handbook and manual are the same for every employee in the program. Nothing is tailored to individual needs or circumstances. All of this violates the ADA's and Rehabilitation Acts mandate of individualized assessment. Every pilot in the HIMS program must follow the same set of requirements and purchase the same voluminous package of services – for years.

59. United's approach is different from FAA or DOT requirements which are tailored to the individual. Also, unlike the FAA medical standards and federal regulatory structure, United has no process by which to challenge the alcohol dependent designation ?)its hand-selected experts make. Indeed, in this case, Plaintiff did not even get to exercise his contractual right to a

second opinion. Also, unlike the FAA, the United requirements for a pilot are not based upon any medical diagnosis, findings, or observable medical indicator. Also, unlike the FAA or regular medical providers in the addiction field, United and their agents make determinations about the pilot's right to work based upon anonymous sources and unsupported evidence.

60.     ALPA, more than a passive participant, plays an active and driving role in administering the HIMS program. ALPA personnel, like Margaret Hendrix and John Hanson, coordinate treatment plans, dictate required steps, and serve on oversight committees. As part of their contract with United delegating specific duties for administration of the HIMS program, ALPA requires that no manager can contact or speak to a pilot directly once the pilot has signed the HIMS contract.

61.     United's Pilot Agreement provides the option for a pilot to purchase a specific long-term disability ("LTD") plan to pilots who are unable to exercise the privileges of their FAA issued First Class Medical Certificate.  The LTD plain is a VEBA/ERISA Trust administered by a quasi-independent organization with significant operational control vested in a committee comprised of ALPA and UAL managers – none of whom have medical qualifications.  This regulated entity also provides significant tax benefits to United.  This pilot benefit has no expiration except retirement, death or termination. By enrolling in HIMS, Plaintiffs lose these benefits because enrollment in the United HIMS program entitles the pilot to only two years worth of LTD benefits and requires pilots to 'confess' to a medical diagnosis of alcohol dependence despite the fact that no diagnosis was ever made, and was specifically ruled out, while contractually waiving all other LTD benefits.   As a result, pilots lose a very valuable lifetime benefit.

62. In this case, by forcing Plaintiff into a HIMS based LTD plan, United and ALPA deprived Plaintiff the benefits he would have received had his LTD been properly classified as a head injury, a concussion or an undiagnosed loss of consciousness.

63. Defendants concealed Plaintiff's LTD rights and coerced Plaintiff into signing documents that would waive those protections, in violation of ERISA's anti-interference restrictions and the ADA.

64. Once "the HIMS process" starts, there appears to be no way out. Substance abuse experts often disagree with United's diagnosis, but it does not matter. Once you are in, you are in for good. When Plaintiff returned from the Azores, Hendrix stated "Once the HIMS process is started, it cannot be stopped."

65. Indeed, both United and ALPA told Tallon, "There is no way out. Once you have agreed to HIMS, you cannot back out."

**E. Tallon Complies with HIMS.**

66. When Plaintiff entered the HIMS program, he tried to comply.

67. Between September 26, 2023, and November 10, 2023, Plaintiff completed an intensive outpatient program. Each session was three hours in length, facilitated by therapist/moderator Matt Ahlberg, LCSW. At the conclusion of the program, Ahlberg confirmed – Plaintiff was not alcoholic. He stated: "After working with Mike since his admission, he doesn't meet the criteria for alcohol use disorder."

68. During this time, Plaintiff also completed ninety consecutive days of AA attendance.

69.     Plaintiff obtained an AA sponsor. He agreed that Plaintiff was not alcoholic. Plaintiff provided his sponsor's contact information to United's EAP, but on information and belief, EAP never called him.

70.     In early 2024, Plaintiff began an aftercare program at High Flight Aftercare led by Timothy J. Gaither. He is a licensed professional counselor that United chose for Plaintiff. Gaither confirmed that Plaintiff was not alcoholic stating:

> "Based on my personal weekly observations/interactions of Michael for over five months and a lack of a drinking history or a history of unmanageability, **I do not believe he meets the DSM V diagnostic criteria for AUD or the DSM IV diagnostic criteria for Alcohol Dependence.** My recommendation is that Michael receive a second opinion from a psychiatrist…"

71.     Plaintiff also attended monthly HIMS meetings, peer pilot, chief pilot and EAP check-ins, and blew into a Soberlink breathalyzer twice a day. No issues arose in the meetings or tests.

## F. Professionals Consistently Conclude Tallon Does Not Have a Drinking Problem.

72.     On October 2, 2023, one week after his release from High Watch, Plaintiff saw Dr. Robert J. Bailey, his Primary Care Physician. (Dr. Bailey has a special medical credential from the Department of Defense to treat Traumatic Brain Injury in combat soldiers) It was the first time Plaintiff had been examined by a real medical doctor since his fall. Dr. Bailey was shocked that Plaintiff had not yet received a trauma evaluation for his workplace injury.

73.     Dr. Bailey explained to Plaintiff how fortunate he was to have avoided post-injury complications from the pressurized flight home. He ordered an MRI exam and discussed the need for a neurological evaluation after all the symptoms had resolved – typically 10-12 months after injury – since it was too late to do the optimal post-injury neurological evaluation.

74.     After careful review of the records, Dr. Bailey noted, **"[I]t appears [neither] patient nor his psychiatrist feel that patient has alcohol use disorder. I do agree with this statement. Patient is medically cleared to return to work with no restrictions from my perspective."**

75.     Plaintiff shared Dr. Bailey's assessment with United. It did not care. It did not allow Plaintiff out of the HIMS program.

76.     In November 2023, United assigned Defendant Dr. Robert Noven to be Plaintiff's HIMS Air Medical Examiner. Dr. Noven is not a psychologist, psychiatrist or substance abuse professional.  He is qualified in internal medicine – which means he has the medical education to understand the importance of a work-up for a head injury by a trauma team and neurologist referral.  He is also an FAA AME, which requires knowledge and familiarity with the FAA Guide for Aviation Medical Examiners ("Guide") and its specific mandates for an AME to follow in case of a pilot head injury: the Head Injury Checklist.

77.      On December 19, 2023, Plaintiff met with Dr. Noven. He reviewed his medical records with Dr. Noven including High Watch records stating, "No diagnosis," Bailey's records, intensive outpatient program records, aftercare and AA reports – all showing no alcohol dependence.

78.     Plaintiff explained to Dr. Noven he was not alcoholic. Rather than reaching out to FAA to state a mistake had been made, Dr. Noven, at United's behest, ordered Plaintiff to undergo some unspecified neuropsychological testing from Dr. Maya Yutsis. (Predicate Act) However, Dr. Noven did not write the required medical referral or order for the testing. Instead United ordered Tallon to call Yutsis and 'schedule' the 'testing' directly.  This is as medically

inappropriate as a person 'scheduling' himself for an MRI exam or chemotherapy session without a medical doctor's referral or order.

79.     In January 2024, **Dr. Yutsis met with Plaintiff and informed him there was no basis for neuropsychological testing in the absence of a diagnosis.**

80.     When Dr. Yutsis read Plaintiff's medical chart, she raised a red flag. "This is strange," she commented, "there is no diagnosis here. **You have not been diagnosed with anything.**" Plaintiff then explained what he had been telling everyone – he was never an alcoholic, had never abused alcohol, every test and every MD confirmed it. He explained about his fall and his own doctor's diagnosis of a head injury.

81.     Despite her review of his charts, noting the injury and the lack of appropriate medical care and the complete lack of alcohol diagnosis – she shrugged it off, with the comment "Well, 'they' sent you here, we might as well do 'the testing' anyway – without yet informing Plaintiff of which medical tests she would perform."

82.     Dr. Yutsis then proceeded to administer  six hours of neurocognitive tests which the FAA requires for persons diagnosed with HIV/AIDS, Parkinson's and other neurological diseases, or diagnosed alcohol dependence .

83.     During the course of the six hours of testing, Dr. Yutsis again mentioned to Plaintiff that his case was different because he did not meet the criteria for alcohol dependency and stated "it's a shame you have to take this risk, since a bad score can threaten your medical certificate, when there is not any diagnosis requiring your taking the test."

84.     Upon learning for the first time that he was subjecting himself to unnecessary tests which could risk his medical certificate, Plaintiff and Dr. Yutsis agreed to discontinue the testing.

85.     On February 5, 2024, Plaintiff once again spoke with Dr. Noven. Plaintiff asked Dr. Noven why he sent him to Dr. Yutsis, as neuropsychological testing was not warranted or medically appropriate.

86.     On February 8, 2024, United, through Dr. Noven, mandated that Plaintiff see a psychologist for treatment of "anxiety and denial of (alleged) "alcoholism." (Predicate Act) He did. He went to United's hand-picked psychologist, Eric Braun, a licensed forensic Social Worker and  qualified Substance Abuse Professional ("SAP"). A SAP designation by the Department of Transportation certifies that the evaluator is qualified to perform a DOT Substance Abuse Evaluation ("SAE").

87.     Plaintiff then attended a 14-session DOT-compliant Substance Abuse Evaluation with Braun. In accordance with the DOT regulations mandating what must be included in a SAE for pilots, per FAA rules, the SAE must include a Fitness for Duty assessment of the pilot. On April 11, 2024, Mr. Braun wrote:

> "…information reflecting the extensive collateral sources and interview I have pursued from past treatment facilities, family, friends, colleagues from the airline industry and Mr. Tallon's AA (Alcoholics' Anonymous) Sponsor indicated exemplary compliance with all expectations of all relevant familial, social, treatment and job-related roles. **All such sources were consistent that Mr. Tallon did not have a drinking problem** despite their being pressed by me as to describe the variety of settings that they encountered Mr. Tallon in, how many times, and to describe his behavior in those environments to me in detail."

88.     Also, on April 19, 2024 Tallon's personal physician, Dr. Robert Bailey, had advised:

> "Given the absence of any objective indications, I do not recommend any additional referrals regarding alcohol use disorder. Additionally, there is no medical basis for further Neurocognitive assessments in Mr. Tallon's case."

89. On April 22, 2024, the day *after* receiving Braun's report which showed Plaintiff did not meet DSM or CFR or DOT SAE criteria for any alcoholic disorder, nor "anxiety" nor "denial", Jen

Wegener called Plaintiff and told him that United wanted him to reschedule the neurocognitive test with Dr. Yutsis. (Predicate Act)   Plaintiff objected. He had sent reams of information to United confirming that he was not alcoholic and was finished with the nonsense.

90.     Following the Braun evaluation, United retaliated against Braun because he did not give it the diagnosis for which it was looking.  (Predicate Act)

91.     Dr. Robert Noven, United's HIMS AME, personally called and threatened Braun. He insisted that Braun change the diagnosis. According to Braun, on the afternoon of April 25, 2024, Dr. Noven phoned him and identified himself as the  "United Airlines Psychologist." He stated he wanted to discuss Braun's report about Plaintiff. Dr. Noven vehemently disputed Braun's findings. He verbally criticized Braun's testing and methods. Dr. Noven told Braun that his report was only supposed to validate Dr. Henry's previous finding of likely alcohol dependence per the CFR and to treat Plaintiff's "denial and anxiety." (Predicate Act)

92.     When Braun refused to change his report, United fired him as Tallon's psychologist and refused to pay his bill.  (Predicate Act) When Tallon asked about the bill – which he was then forced to pay – Jen Wegener wrote to him that United would not pay it because if they did then it would need to list a diagnostic code. (Exhibit I).   She failed to mention that if it listed the diagnostic code – a pilot's SAE – that then United would have to recognize the conclusion: no diagnosis.  (Predicate Act)

93.     This act led to formal complaints against Dr. Noven with the Illinois Department of Financial and Professional Regulation and to the FAA.

94.     On April 19, 2024, Dr. Robert J. Bailey, Plaintiff's doctor wrote:

"During my tenure of his healthcare, I have never treated Michael for any alcohol use disorders. Furthermore, upon reviewing all medical records made available to all to me from the High Watch Recovery Center, **I find no evidence of any medical**

**indication of an alcohol use disorder. There is also no clinical evidence to suggest having him have any further testing related to alcohol use disorder.**

**Given the absence of any objective indications, I do not recommend any additional referrals regarding alcohol use disorder.** Additionally, there is no medical basis for further neurocognitive assessments in Mr. Tallon's case."

95.     On May 8, 2024, Dr. Bailey completed Plaintiff's annual physical, blood workup and tests. He, once again, confirmed that Tallon had no alcohol use or dependence.

96.     On May 17, 2024, Plaintiff complained – again – to United about it regarding him as alcoholic when the consistent medical evidence showed he was not. He also complained about being ordered to take an unnecessary test.

97.     On June 5, 2024, Dr. Noven resigned as Plaintiff's HIMS AME. He then retaliated against Plaintiff by writing a secret note to FAA suggesting Plaintiff is alcoholic and belonged in the HIMS program – conditions which would cancel his medical. (Predicate Act)

98.     On the same day Dr. Noven called Dr. Matt Dumstorf, the FAA doctor in charge of evaluating pilot medicals involving a charge of alcohol or drug use, on this private cell phone and provided off-the-record information indicating that Tallon should not be issued a medical because he was objecting to the HIMS program and had complained about Noven.  (Predicate Act)  Dr. Dumstorf promptly reported the inappropriate cell phone call on Tallon's official FAA record.

99.     On June 11, 2024, the ORD Base Monitoring Committee demanded that Plaintiff complete his neuropsychology behavior testing with Dr. Yustis. In a letter, it suggested that the FAA required such testing. This was a lie. The FAA had not dubbed Plaintiff as substance dependent and did not require any neurological testing as a  requirement for the issuance of a medical certificate. Plaintiff refused to submit to further unnecessary and now retaliatory testing. (Predicate Act)

100.    On June 21, 2025, Tallon filed a complaint with United objecting to its orders that he receive unnecessary medical testing. Later that day, Plaintiff received a letter from the BAC recommending he be removed from the HIMS program. (Predicate Act)

101.    On July 8, 2024, Plaintiff was officially removed from HIMS.

102.    On November 22, 2024, United issued a Letter of Charge charging Plaintiff for failing to comply with the United HIMS program requirements.

103.    In early December, Tallon decided to pursue his medical certificate without the "help" of United Airlines and ALPA. His independent AME, also qualified as a HIMS AME, properly completed the FAA Head Injury checklist with the neurological assessments, including the sub-portion which assessed alcohol use; reviewed all of Tallon's records including the voluminous HIMS file generated by United and all of the independent psychiatric and addiction workups by qualified doctors,

104.    On December 19, 2024,United held a formal Letter of Charge hearing grounded on the false alcohol narrative and Plaintiff's alleged refusal to cooperate with HIMS, despite possessing conclusive evidence of Plaintiff's medical innocence. (Predicate Act)

105.    After a hearing, on February 2025, United fired Plaintiff because he allegedly would not comply with the HIMS program, even though he is not an alcoholic.

106.    On August 11, 2025, Tallon submitted a demand that he receive an unconditional offer of reinstatement.

107.    Since Tallon's firing, the FAA has issued Tallon an unrestricted First Class medical, agreeing with his AME and all of the doctors who examined him.

## CLAIMS FOR RELIEF

### COUNT I
### VIOLATION OF THE ADA (42 U.S.C. § 12101 et seq.) (Discrimination)
### (Against United and ALPA)

108.    Plaintiff incorporates the foregoing paragraphs as if fully restated herein.

109.    The ADA prohibits discrimination against individuals who are disabled or "regarded as" disabled.

110.    United and ALPA regarded Plaintiff as alcohol dependent.

111.    United and ALPA regarded Plaintiff as an alcohol abuser.

112.    United and ALPA  instructed Plaintiff to undergo unnecessary testing and treatment.

113.    United fired Plaintiff because he refused to submit to unnecessary neuropsychological testing.

114.    United and ALPA imposed other treatments, testing, and monitoring requirements on Plaintiff based in part on their perception that Plaintiff is alcohol dependent.

115.    United and ALPA shared information about Plaintiff's alleged disability in violation of the ADA.

116.    United and ALPA's actions violate the ADA's prohibition on discrimination against individuals regarded as having a disability, especially when based on false or unverified assumptions.

117.    United and ALPA's actions also violated the ADA by failing to provide reasonable accommodations for Plaintiff's actual, documented concussion, instead imposing punitive measures for a condition he did not have.

118.    These actions, when viewed in their totality, constitute systemic violations of federal law, medical ethics, and Plaintiff's fundamental rights as an employee and as a person with a perceived and actual medical condition.

119.    Defendants' conduct constitutes discrimination under the ADA.

120.    Plaintiff suffered damages due to Defendants' conduct.

**COUNT II**
**VIOLATION OF THE ADA (42 U.S.C. § 12101 et seq.) (Retaliation)**
**(Against United and ALPA)**

121.    Plaintiff incorporates the foregoing paragraphs as if fully restated herein.

122.    Defendants fired Plaintiff because he complained about unnecessary medical treatment and tests and United and ALPA's wrongful perceptions of him.

123.    Plaintiff suffered damages due to Defendants' conduct.

**COUNT III**
**VIOLATION OF THE REHABILITATION ACT (29 U.S.C. § 701 et seq.)**
**(Against ALPA)**

124.    Plaintiff incorporates the foregoing paragraphs as if fully restated herein.

125.    ALPA receives federal financial assistance for its work with HIMS programs. It is subject to the Rehabilitation Act.

126.    ALPA engaged in and facilitated discrimination against Plaintiff based on a perceived disability, denying him rights and benefits provided to similarly situated employees.

127.    ALPA also failed to ensure that Plaintiff's medical care and employment rights were protected under applicable federal law in retaliation for Plaintiff's resistance to the HIMS program.

128.    Plaintiff suffered damages due to ALPA's conduct.

## COUNT IV
## INTERFERENCE WITH ERISA-PROTECTED LTD BENEFITS
### (Against United and ALPA)

129.    Plaintiff incorporates the foregoing paragraphs as if fully restated herein.

130.    Following his head injury, Plaintiff was entitled to long-term disability benefits under an ERISA-covered plan.

131.    Defendants interfered with those rights by coercing Plaintiff to waive benefits, providing misinformation, and directing false diagnoses reporting to influence LTD eligibility determinations.

132.    A United Airline representative instructed Plaintiff to put false information on his LTD application with the intent of denying him the full LTD benefits he would have received if he had listed his head injury as the reason for his inability to work. (Predicate Act)

133.    Had Defendants recognized Plaintiff's actual medical problem, a likely concussion, Plaintiff could have been immediately invoked in United's LTD and been receiving its benefits.

134.    Plaintiff ultimately applied for LTD providing all relevant medical information regarding his head injury. Full LTD was granted - including back pay. Soon after his LTD was granted and back pay issued, United fired Plaintiff.

135.    Defendants' unlawful termination resulted in Plaintiff being denied ongoing LTD benefits.

## COUNT V
## VIOLATION RICO, 18 U.S.C. § 1962(c)
### (All Defendants)

136.    Plaintiff repeats and realleges all preceding paragraphs as if fully set forth herein.

The Enterprise

137.     Defendants, including United Airlines, ALPA, Dr. Robert Noven and Dr. Stanford Henry,  and other yet-identified actors, constitute an association-in-fact enterprise under 18 U.S.C. § 1961(4).

138.     The enterprise's purpose was to coerce pilots into the HIMS substance-abuse monitoring program regardless of actual medical need, generate revenue for treatment providers and psychiatrists, conduct the HIMS research program "Study" on pilots, and remove pilots from flight duty without lawful cause.

Conduct of the Enterprise

139.     Defendants conducted and participated, directly or indirectly, in the affairs of the enterprise through a pattern of racketeering activity under 18 U.S.C. § 1961(5), as set forth below.

Pattern of Racketeering Activity

140.     Defendants committed the predicate acts which are identified throughout this complaint. They include:

- o   Extortion (Hobbs Act) by coercing pilot into HIMS program and threats regarding employment.

- o   Mail/Wire Fraud in submitting false reports to FAA, High Water, and insurance carriers.

- o   Health Care Fraud by causing payments for unnecessary treatment and false diagnoses.

- o   Witness Tampering in pressuring psychologists to change diagnoses

- o   Economic coercion in demanding unnecessary testing

Injury to Plaintiff

141.    Plaintiff suffered loss of employment, FAA medical certificate status, unpaid wages, reputational damage, and emotional distress, as a direct result of the RICO violations.


## COUNT VI
## RICO CONSPIRACY, 18 U.S.C. § 1962(d)
### (Against All Defendants)

Plaintiff repeats and realleges all preceding paragraphs, including Count V.

Agreement to Participate in the Enterprise

142.    Beginning with the past 10 years  and continuing thereafter, Defendants knowingly and intentionally agreed to conduct or participate in the affairs of the enterprise through a pattern of racketeering activity under 18 U.S.C. § 1961(5).

143.    Each Defendant knew of and agreed to the scheme to coerce pilots into HIMS, generate revenue, falsify records, and remove pilots from flight duty without cause.

Acts in Furtherance of the Conspiracy

144.    Defendants committed, or caused others to commit, multiple acts constituting predicate acts, as detailed in Exhibit A, including extortion, mail/wire fraud, health care fraud, witness tampering, and economic coercion.

Overt Acts and Participation

145.    Overt acts include directing cancellation of legitimate medical evaluations, ordering unnecessary neuropsych testing, coercing High Watch and psychologists, transmitting fraudulent communications to FAA and insurers, and threats regarding employment and FAA certificate.

Knowledge and Intent

146.     Defendants intentionally participated in the conspiracy, agreeing to the scheme and taking acts in furtherance of it.

## COUNT VII
## FRAUD AND CONSPIRACY TO DEFRAUD
### (Against All Defendants)

147.     Plaintiff incorporates the foregoing paragraphs as if fully restated herein.

148.     Defendants knowingly submitted false records and insurance claims to Aetna and FAA, describing Plaintiff as alcohol dependent when overwhelming medical evidence showed otherwise.

149.     The FAA relied on these representations to Plaintiff's detriment, resulting in loss of income, benefits, and professional standing.

150.     Dr. Noven, through back channels at the FAA (Predicate Act) charged Plaintiff with alcohol dependence despite all evidence to the contrary.

151.     The Defendants' actions cause Plaintiff harm.

## COUNT VIII
## INTENTIONAL INTERFERENCE WITH BUSINESS RELATIONSHIP
### (Against Dr. Noven and Dr. Henry)

152.     Plaintiff incorporates the foregoing paragraphs as if fully restated herein.

153.     Dr. Henry prepared a report which claimed to be a Fitness For Duty evaluation of a pilot, and claimed to 'diagnose' alcohol dependence according to CFR criteria – when in fact he did not perform a Fitness For Duty examination as defined by any medical authority, did not follow FAA requirements for a Fitness for Duty or HIMS psychiatric evaluation, and did not make any diagnosis.

154.     Dr. Noven, through back channels at the FAA charged Plaintiff with alcohol dependence despite all evidence to the contrary.

155.     The day after Dr. Noven's FAA report, the FAA reached out to Plaintiff to say his previously unrestricted medical certificate was under review. Dr. Noven interfered with Plaintiff's relationship with his employer and the government licensing agency upon which his certification and licenses depend. This caused Plaintiff damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

A.  Enter judgment in favor of Plaintiff and against Defendants on all counts;

B.  Award compensatory damages for lost wages, emotional distress, reputational harm, and benefits;

C.  Award punitive damages where permitted;

D.  Issue injunctive relief requiring United Airlines to abandon its HIMS program and create a new one which complies with the law;

E.  Award attorneys' fees and costs pursuant to applicable federal statutes;

F.  Grant such further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all triable issues.

Dated on this 19th day of September, 2025.

        **HANSEN REYNOLDS LLC**

       By: /s/ Michael C. Lueder
        Michael C. Lueder
        301 N. Broadway, Suite 400
        Milwaukee, Wisconsin 53202
        (414) 455-7676 (phone)
        (414) 273-8476 (fax)
        mlueder@hansenreynolds.com

        *Attorney for Plaintiff*