**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **Michael Tallon,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 25 C 7529** |
| **v.** | ) | |
| | ) | **Judge Jorge L. Alonso** |
| | ) | |
| **United Airlines, Inc., Air Line Pilots Association, Dr. Robert Noven, and Dr. Stafford Henry,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**Memorandum Opinion and Order**

Plaintiff, Michael Tallon, a former pilot for United Airlines, Inc. ("United"), brings this suit against his former employer, his union, and two medical professionals who examined him, asserting claims of disability discrimination, civil RICO, and intentional torts governed by state law. His claims arise out of his enrollment in a substance-abuse treatment program administered by his employer, which he claims to have been needlessly forced to undergo. The defendants have moved to dismiss under Federal Rule of Civil Procedure 12(b). For the following reasons, the motions to dismiss are granted.

## I. Background

For purposes of the present motion to dismiss, the Court assumes the truth of the following factual allegations contained in the operative complaint. On June 10, 2023, while on a layover in the Azores, Plaintiff tripped on an uneven sidewalk and suffered a head injury. A colleague afterward observed his deteriorating speech and confusion. At one point that evening, Plaintiff called his wife and asked to speak to his mother, which alarmed Plaintiff's wife—his mother had

passed away twenty years earlier. Plaintiff called a United manager and asked to be removed from flight duty the next day.

Plaintiff also spoke with Margaret Hendrix, who serves as United's Air Line Pilots Association, International ("ALPA") representative on the Human Intervention Motivation Study ("HIMS") Steering Committee. HIMS is a collaborative substance-abuse treatment program developed by the Federal Aviation Administration ("FAA"), in cooperation with various airlines and ALPA, a labor union representing airline pilots, including Plaintiff. The HIMS program "provide[s] a system whereby afflicted individuals [with alcoholism or other substance use disorders] are treated and successfully returned to the cockpit under the FAA Special Issuance Regulations (14 CFR 67.401)."[1] Under FAA regulations, airline pilots need a medical certificate to fly, and they may not hold a first-class medical certificate such as Plaintiff's if they have an "established medical history or clinical diagnosis of . . . [s]ubstance dependence." 14 C.F.R § 67.107(a)(4). However, "[a]t the discretion of the Federal Air Surgeon," who exercises authority delegated to him by the FAA Administrator, "an Authorization for a Special Issuance of a Medical Certificate . . . may be granted to a person" who does not otherwise qualify for a medical certificate. *Id.* § 67.401(a). The HIMS program provides a process for pilots who have struggled with addiction to demonstrate that they can safely return to work via a Special Issuance Authorization.

When Plaintiff spoke to Hendrix on June 10, 2023, he was "disoriented and confused," in a "concussed fog" (Am. Compl. ¶¶ 18-19), and his recollection of their phone conversation is fuzzy. Hendrix said afterward that he told her that he needed help with his drinking.

The following day, Plaintiff flew home as a passenger. Upon his return, United and ALPA representatives called him and pressured him to admit to alcoholism. He denied that he had an

---

[1] https://himsprogram.com/about-hims/.

alcohol problem, but Hendrix warned him that, if he did not confess to a drinking problem, he would never fly for United again. Plaintiff received no care for his head injury. Instead, Hendrix arranged for him to enroll in an inpatient treatment program for alcoholism.

Plaintiff had an upcoming appointment with an Aviation Medical Examiner ("AME") for renewal of his medical certificate, but United and ALPA induced him to cancel that appointment and instead submit to an evaluation by a psychiatrist, Dr. Stafford Henry. Dr. Henry did not examine Plaintiff for a head injury, but did interview him and administer tests relevant to whether he suffered from alcoholism. Although there was no physical evidence of alcohol dependence in any of Dr. Henry's test results, Dr. Henry spoke to "collateral sources," and he wrote a report in which he opined that "the totality of all available clinical information . . . supports the diagnosis of alcohol dependence, per FAR's (*i.e.* 'Drinking in larger amounts and over longer periods than intended.')." (Henry Report, ALPA Mot. App. 27, Dkt. No. 48-1.) "FAR's" stands for "federal aviation regulations." Dr. Henry explained that he spoke with numerous sources who knew Plaintiff and purported to be familiar with his drinking habits, some of whom suggested that he did not have a drinking problem, and some of whom suggested, based on what they had observed and what Plaintiff told them, that he did. (*Id.* App. 36-39.) Based on these accounts and the "totality of all available clinical information," Dr. Henry reached the conclusion that "a diagnosis of Alcohol Dependence, per FAR's," was "appropriate." (*Id.* App. 42.)

Plaintiff contacted John Hanson, an ALPA attorney, and asked to challenge Dr. Henry's report, pursuant to his rights under the collective bargaining agreement ("CBA") between United and ALPA. Hanson warned Plaintiff that challenging the report or securing outside representation to do so would look like denial, would likely result in harsh treatment, and could lead to

termination. On August 28, 2023, Plaintiff entered an inpatient treatment facility known as High Watch Recovery Center ("High Watch") in Connecticut, where he remained for twenty-eight days.

On September 21, 2023, while Plaintiff was still at High Watch, he met with Hendrix and two United representatives: James Bono, the chief pilot in Chicago, and Jen Wegener, an Employee Assistance Program ("EAP") representative. Hendrix, Bono, and Wegener instructed Plaintiff to sign a contract to enter United's HIMS program. Plaintiff was reluctant because he did not believe he had an alcohol problem, but he was told that he would be fired if he did not sign. He signed the contract under "coercion and duress." (Am. Compl. ¶ 37.) The contract provided that Plaintiff would "comply with the [HIMS] program requirements," and that failure to do so could result in "loss of benefits, a recommendation for [Special Issuance] revocation, or termination from the company." (HIMS Compliance Contract, ALPA Mot. App. 44, Dkt. No. 48-1.) Plaintiff was discharged from High Watch on September 25, 2023. He was not diagnosed with an alcohol use disorder by anyone who examined him at High Watch.

United or ALPA (Plaintiff does not know which) submitted a false claim form to an insurer stating that he had suffered withdrawal symptoms during his early days at High Watch. Plaintiff showed Bono records from High Watch to demonstrate that he had not been diagnosed with alcohol use disorder, hoping that he would be allowed to terminate the HIMS contract. Bono told him he had to comply with the requirements of the HIMS program or be fired.

Under the United Pilot Agreement ("UPA"), United's collective bargaining agreement with ALPA, pilots have the option to purchase a long-term disability ("LTD") plan, which covers them in case they cannot exercise the privileges of their FAA medical certification. A pilot who enrolls in a HIMS program, which entails confessing to alcoholism to receive a two-year HIMS-related LTD benefit and waiving other LTD benefits, puts this bargained-for LTD benefit at risk.

Between September 26, 2023, and November 10, 2023, Plaintiff completed an intensive outpatient counseling program facilitated by a therapist, Matt Ahlberg. At the conclusion of the program, Ahlberg stated that Plaintiff "doesn't meet the criteria for alcohol use disorder." (Am. Compl. ¶ 67.) Plaintiff also attended Alcoholics Anonymous ("AA") meetings.

On October 2, 2023, Plaintiff met with his primary care physician, Dr. Robert J. Bailey. Dr. Bailey was dismayed that Plaintiff had not been evaluated for his head injury, and he ordered an MRI exam, with a neurological evaluation to follow in seven to nine months. Dr. Bailey noted that neither Plaintiff "nor his psychiatrist feel that [Plaintiff] has alcohol use disorder." (*Id.* ¶ 74.) Dr. Bailey agreed. Plaintiff shared Dr. Bailey's assessment with United, but United would not agree to let Plaintiff out of his HIMS commitment.

On December 19, 2023, Plaintiff met with Dr. Robert Noven, a physician trained in internal medicine who was assigned by United to be Plaintiff's HIMS AME. Plaintiff reviewed with Dr. Noven extensive records of his treatment, which showed, according to Plaintiff, that he was not suffering from alcohol dependence. Dr. Noven directed Plaintiff to undergo neuropsychological testing, the nature of which Plaintiff did not fully understand, from Dr. Maya Yutsis.

In January 2024, Plaintiff met with Dr. Yutsis, who found it strange that Plaintiff had been sent for neuropsychological testing, although his "medical chart" did not reflect that he had been "diagnosed with anything." (*Id.* ¶ 80.) Plaintiff told her that he had tried to explain to United and to various people involved in his treatment process that that he was never actually an alcoholic. Dr. Yutsis "shrugged" and concluded that they "may as well" do the testing anyway. (*Id.* ¶ 81.) She performed six hours of neurocognitive tests. During the course of this testing, she mentioned to Plaintiff, again, that his case was strange, and she considered it "a shame" that he had to submit to testing, even though there was no "diagnosis requiring [him] to take the test," because a "bad

score" could threaten his medical certificate. (*Id.* ¶ 83.) Alarmed to learn of this threat to his medical certificate, Plaintiff decided to discontinue the testing.

On February 5, 2024, Plaintiff spoke with Dr. Noven again. He asked why Dr. Noven had sent him to see Dr. Yutsis. Dr. Noven then sent Plaintiff to a psychologist, Eric Braun, for "anxiety" and "denial of (alleged) alcoholism." (*Id.* ¶ 86.) Braun performed a full, 14-session substance abuse evaluation with Plaintiff. On April 11, 2024, he wrote that Plaintiff was "in compliance with all expectations" and all sources he had interviewed "were consistent that [Plaintiff] did not have a drinking problem." (*Id.* ¶ 87.)

On April 22, 2024, two days after she received Braun's report, Wegener called Plaintiff and told him that United wanted him to reschedule the neurocognitive testing with Dr. Yutsis. Plaintiff objected because he had "sent reams of information to United confirming that he was not [an] alcoholic and was finished with the nonsense." (*Id.* ¶ 89.)

On April 25, 2024, Braun received a phone call from Noven, who did not identify himself by name. Dr. Noven "vehemently disputed Braun's findings" and criticized his methodology. Plaintiff was forced to pay Braun's bill because United refused to pay it. Jen Wegener told Plaintiff that for United to pay the bill, "it would need to list a diagnostic code." (*Id.* ¶ 92.) Plaintiff contends that this was an excuse and a ruse that United employed to avoid payment for Braun's report because it did not approve of his conclusion.

In early 2024, Plaintiff began an aftercare program, High Flight, led by Timothy J. Gaither. After five months in the program, Gaither stated that Plaintiff is not dependent on alcohol. Plaintiff also attended regular HIMS meetings, met with pilots and EAP representatives, and blew into a breathalyzer twice a day.

On June 5, 2024, Dr. Noven resigned as Plaintiff's HIMS AME. However, Dr. Noven wrote a "secret note to FAA" stating that Plaintiff is an alcoholic who belongs in the HIMS program. (*Id.* ¶ 97.) Dr. Noven also called Dr. Matt Dumstorf, an FAA physician with responsibility for medical certification of pilots implicated in drug or alcohol use, and informed him that Plaintiff should not be issued a medical certificate because he had objected to the HIMS program and had complained about Dr. Noven.

In a June 11, 2024 letter, United confirmed that Plaintiff must complete his neuropsychological testing with Dr. Yutsis. Plaintiff refused. On June 21, he filed a complaint with United to formally object to the testing. He was officially removed from the HIMS program on July 8, 2024. On November 22, 2024, United issued Plaintiff a "Letter of Charge" for failing to comply with the requirements of the HIMS program. After a hearing in February 2025, Plaintiff was terminated.

Plaintiff had allowed his medical certificate to lapse. Prior to his termination, Plaintiff began to pursue a medical certificate independently of United. He saw an independent AME who conducted a full examination, including a neurological assessment to determine if there were any lingering effects from his head injury. As of the date of the operative Amended Complaint, Plaintiff holds an unrestricted first-class medical certificate.

## II. Legal Standards

Defendants—United, ALPA, Dr. Noven, and Dr. Henry—move to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). "Rule 12(b)(1) is the means by which a defendant raises a defense that the court lacks subject-matter jurisdiction." *Bazile v. Fin. Sys. of Green Bay, Inc.*, 983 F.3d 274, 279 (7th Cir. 2020). "A motion under [Federal] Rule [of Civil Procedure] 12(b)(6) tests whether the complaint states a claim on which relief may be granted."

*Richards v. Mitcheff*, 696 F.3d 635, 637 (7th Cir. 2012). In evaluating a Rule 12(b)(6) motion, the Court may consider, "in addition to the allegations set forth in the complaint itself, documents that are attached to the complaint, documents that are central to the complaint and are referred to in it, and information that is properly subject to judicial notice." *Williamson v. Curran*, 714 F.3d 432, 436 (7th Cir. 2013).

A complaint must include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The short and plain statement under Rule 8(a)(2) must "give the defendant fair notice of what the claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (cleaned up). Under this standard, a plaintiff's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Id.* Stated differently, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly,* 550 U.S. at 570).

Typically, plaintiffs need not plead around affirmative defenses in order to survive a Rule 12(b)(6) motion to dismiss. *See Bausch v. Stryker Corp.*, 630 F.3d 546, 561 (7th Cir. 2010); *Benson v. Fannie May Confections Brands, Inc.*, 944 F.3d 639, 645 (7th Cir. 2019). Still, it may be appropriate to grant a Rule 12(b)(6) motion to dismiss based on an affirmative defense "where the allegations of the complaint itself set forth everything necessary to satisfy the affirmative defense." *Sidney Hillman Health Ctr. of Rochester v. Abbott Lab'ys, Inc.*, 782 F.3d 922, 928 (7th Cir. 2015) (internal quotation marks omitted).

Any claims of fraud or that include acts of fraud must comply with Federal Rule of Civil Procedure 9(b), which requires the pleading party to "state with particularity the circumstances constituting fraud." *United States ex rel. Presser v. Acacia Mental Health Clinic, LLC*, 836 F.3d

770, 775 (7th Cir. 2016). Describing the circumstances with particularity may require including such information as "the identity of the person who made the misrepresentation, the time, place and content of the misrepresentation, and the method by which the misrepresentation was communicated." *Windy City Metal Fabricators & Supply, Inc. v. CIT Tech. Fin. Servs., Inc.*, 536 F.3d 663, 668 (7th Cir. 2008). In other words, Rule 9(b) "ordinarily requires describing the 'who, what, when, where, and how' of the fraud, although the exact level of particularity that is required will necessarily differ based on the facts of the case." *AnchorBank, FSB v. Hofer*, 649 F.3d 610, 615 (7th Cir. 2011) (citation omitted).

## III. Analysis

Plaintiff's complaint contains eight counts: Count I, for discrimination in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101, 12112, against United and ALPA; Count II, for retaliation for complaints about ADA discrimination, 42 U.S.C. § 12203, against United and ALPA; Count III, for violation of the Rehabilitation Act ("Rehab Act"), 29 U.S.C. §§ 701 *et seq*., *see* 29 U.S.C. § 794(a), against ALPA; Count IV, for interference with benefits under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1140, against United and ALPA; Count V, for violation of the Racketeering Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c), against all defendants; Count VI, for conspiring to violate RICO, 18 U.S.C. § 1962(d), against all defendants; Count VII, for fraud and conspiring to commit fraud under Illinois common law, against all defendants; and Count VIII, for intentional interference with a business relationship under Illinois common law, against Dr. Noven and Dr. Henry. All four defendants have moved to dismiss.

United and ALPA raise certain preemption- and preclusion-based arguments pursuant to Rule 12(b)(1), although the Court doubts whether these arguments raise issues that should be

understood as going to the Court's subject-matter jurisdiction, as opposed to whether Plaintiff states a claim. *See Hawkins v. Securitas Sec. Servs. USA, Inc.*, No. 09 C 3633, 2011 WL 5122679, at *1 (N.D. Ill. Oct. 28, 2011) (citing *Turek v. Gen. Mills, Inc.*, 662 F.3d 423, 425 (7th Cir. 2011) and *Hughes v. United Air Lines, Inc.*, 634 F.3d 391, 393 (7th Cir. 2011)). It makes no difference in this case, however, because Defendants do not rely on any materials that the Court cannot consider in evaluating a motion to dismiss under Rule 12(b)(6), so the standard is the same. *See Silha v. ACT, Inc.*, 807 F.3d 169, 174 (7th Cir. 2015); *Hawkins*, 2011 WL 5122679, at *3 ("The point ultimately is immaterial, as the result here would be the same regardless of whether [the defendant's] motion is properly brought under Rule 12(b)(1) or whether it should have been brought under [Rule] 12(b)(6)."); *see Sidney Hillman*, 82 F.3d at 928 (explaining that ruling on an affirmative defense raised in a Rule 12(b)(6) motion to dismiss is appropriate where "everything necessary" to the ruling is properly before the court). The Court will treat the present motions as motions to dismiss for failure to state a claim under Rule 12(b)(6).

### A. Discrimination under the ADA and Rehab Act

The ADA provides, as a "[g]eneral rule," that "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to the hiring, advancement, or discharge of employees . . . and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112. "The term 'disability' means, with respect to an individual—**(A)** a physical or mental impairment that substantially limits one or more major life activities of such individual; **(B)** a record of such an impairment; or **(C)** being regarded as having such an impairment (as described in paragraph (3))." 42 U.S.C.A. § 12102(1). A "qualified individual" is an individual who, "with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds." 42 U.S.C. § 12111(8). "To make out a claim under the ADA,

an individual must show: 1) that she is disabled; 2) that she is otherwise qualified to perform the essential functions of the job with or without reasonable accommodation; and 3) that the employer took an adverse job action against her because of her disability or failed to make a reasonable accommodation." *Stevens v. Ill. Dep't of Transp.*, 210 F.3d 732, 736 (7th Cir. 2000).

Plaintiff asserts claims of discrimination under the ADA and Rehab Act against United and ALPA, contending that he was "regarded as" disabled (though he was not actually disabled) due to his alleged alcoholism, and he suffered disparate treatment as a result. He alleges that he was fired for refusing to undergo unnecessary testing related to his alleged alcoholism, and he did not receive a reasonable accommodation for the condition that he actually had, a head injury. He also alleges that ALPA and United violated the ADA by disclosing sensitive health information about his disability or purported disability.

Defendants[2] argue that Plaintiff never requested an accommodation for his head injury, and Plaintiff does not respond to this argument, so the Court considers any claim based on a failure to accommodate his head injury to be waived. *Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010) ("Failure to respond to an argument . . . results in waiver."); *see Jones v. Connors*, No. 11 C 8276, 2012 WL 4361500, at *7 (N.D. Ill. Sept. 20, 2012). Defendants also argue that Plaintiff was not a "qualified individual" at relevant times because he admits that he voluntarily allowed his medical certificate to lapse, and Plaintiff does not dispute it in his response briefs. Instead, he responds that he need not be a "qualified individual" to state a claim under the ADA for (1) Dr. Yutsis's neuropsychological testing, which Plaintiff claims was unnecessary and unlawful, (2) disclosure of confidential medical information, or (3) retaliation.

**1. Unlawful testing under § 12112(d)(4)(A)**

[2] For purposes of this Part III.A. and Part III.B., "Defendants" refers to United and ALPA, the only defendants against whom the ADA and ERISA claims are asserted.

Section 12112(d)(4)(A) of the ADA states that an employer "shall not require a medical examination and shall not make inquiries of an employee as to whether such employee is an individual with a disability or as to the nature or severity of the disability, unless such examination or inquiry is shown to be job-related and consistent with business necessity." 42 U.S.C. § 12112(d)(4)(A). Plaintiff is correct that "[t]his provision applies to all employees, with or without an actual or perceived disability." *Kurtzhals v. Cnty. of Dunn*, 969 F.3d 725, 730 (7th Cir. 2020).

Plaintiff ignores, however, the question of whether the neuropsychological examination he was required to undergo was "job-related and consistent with business necessity." "An 'examination is job-related and consistent with business necessity when an employer has a reasonable belief based on objective evidence that a medical condition will impair an employee's ability to perform essential job functions or that the employee will pose a threat due to a medical condition.'" *Id.* (quoting *Coffman v. Indianapolis Fire Dep't*, 578 F.3d 559, 565 (7th Cir. 2009)). Plaintiff admits that the neuropsychological testing he refused to complete is a necessary part of "substance-dependence protocols" for pilots. (Pl.'s Mem. in Opp'n at 7, Dkt. No. 69.) Plaintiff disputes whether Dr. Henry's report made a "diagnosis" of alcohol use disorder, but parsing the term "diagnosis" is of no help to him; the report indisputably contained facts, including accounts from people who knew Plaintiff, suggesting that Plaintiff may have had an alcohol problem. *See Kurtzhals*, 969 F.3d at 731 (citing *Krocka v. City of Chicago*, 203 F.3d 507, 515 (7th Cir. 2000) ("The position of Chicago police officer certainly presents significant safety concerns . . . . It was entirely reasonable, and even responsible, for CPD to evaluate Krocka's fitness for duty once it learned that he was experiencing difficulties with his mental health.")). And Plaintiff admits that, after Dr. Henry submitted his report, Plaintiff entered an inpatient treatment program, signed a HIMS contract, and received treatment for alcoholism over several months before he even began

his testing with Dr. Yutsis. The fact that Plaintiff now claims to have never had an alcohol problem makes no difference; Plaintiff's own admitted actions, including signing the HIMS contract, entering the inpatient treatment program at High Watch, and undergoing treatment for alcoholism, provided "objective evidence" to support a "reasonable belief" that Plaintiff may have suffered from an alcohol problem, which created a safety risk to himself and his passengers on flights he piloted. Plaintiff has not explained how United could reasonably deviate from its substance-dependence protocols, once so much water had flowed under the bridge.

Plaintiff himself caused and agreed to the triggering of any applicable "substance-dependence protocols" when he entered into the HIMS contract, after entering an inpatient treatment facility. True, Plaintiff claims to have done these things merely to save his job; nevertheless, so far as he has alleged, he was only asked to submit to reasonable testing to ensure that he did not actually have an alcohol problem or related deficiencies. *Cf. MaCewen v. Am. Airlines, Inc.*, No. 1:25-CV-01580-TWP-MJD, 2026 WL 1669698, at *16 (S.D. Ind. June 9, 2026) (concluding that the pilot-plaintiff stated a claim of discrimination under the ADA because his employer imposed HIMS requirements that were so onerous as to be all but impossible to meet). Plaintiff alleges that he was terminated for failing to comply with the requirements of the HIMS program, which provides an independent, non-discriminatory basis for the decision. *See, e.g.*, *McKey v. Occidental Chem. Corp.*, 956 F. Supp. 1313, 1319 (S.D. Tex. 1997). Plaintiff fails to state a claim under the ADA based on the neuropsychological testing that he refused to complete.

**2. Disclosure of medical information**

Plaintiff argues that Defendants violated the ADA by disseminating sensitive test results related to his treatment for his alleged alcoholism among various supervisors, union officials, and third parties. He relies on 42 U.S.C. § 12112(d)(3), which provides as follows:

> A covered entity may require a medical examination after an offer of employment has been made to a job applicant and prior to the commencement of the employment duties of such applicant, and may condition an offer of employment on the results of such examination, if—
>
> . . .
>
> **(B)** information obtained regarding the medical condition or history of the applicant is . . . treated as a confidential medical record, except that--
>
> **(i)** supervisors and managers may be informed regarding necessary restrictions on the work or duties of the employee and necessary accommodations;
>
> **(ii)** first aid and safety personnel may be informed, when appropriate, if the disability might require emergency treatment; and
>
> **(iii)** government officials investigating compliance with this chapter shall be provided relevant information on request; and
>
> **(C)** the results of such examination are used only in accordance with this subchapter.

Of course, this case does not concern any testing performed "prior to the commencement of employment," so, by its plain language, this provision does not apply. Even if it did, Plaintiff does not provide enough detail about the alleged dissemination of confidential health information to state a plausible claim. Plaintiff does not state a claim based on any disclosure of sensitive test results related to his evaluation and treatment for alcoholism.

**3. Retaliation**

Plaintiff claims that he was terminated in retaliation for complaining about disability discrimination. To survive the motions to dismiss based on a retaliation theory, he must plausibly allege that, if he had not complained of discrimination, but everything else was the same, he would not have been terminated or suffered other adverse consequences. *See Blumentritt v. Mayo Clinic Health Sys.-Franciscan Healthcare, Inc.*, No. 17-CV-584, 2019 WL 469315, at *8 (W.D. Wis. Feb. 6, 2019) (citing *Ferrill v. Oak Creek-Franklin Joint Sch. Dist.*, 860 F.3d 494, 501 (7th Cir. 2017)). But, as the above discussion shows, any such conclusion is all but foreclosed by Plaintiff's own allegations. Plaintiff alleges that Defendants advised him to enroll in the HIMS program, and he reluctantly agreed to do so; but then, having enrolled in the program, he refused to complete it, including by refusing to complete testing that he admits is necessary under "substance-dependence

protocols." Any conclusion that he would not have been terminated, but for his complaints about disability discrimination, is implausible based on these allegations. *See id.*; *see also Andonissamy v. Hewlett-Packard Co.*, 547 F.3d 841, 851 (7th Cir. 2008).

For all these reasons, Plaintiff's ADA claims are dismissed. His claims under the Rehab Act, which is "functionally identical" to the ADA, *Wagoner v. Lemmon*, 778 F.3d 586, 592 (7th Cir. 2015), are likewise dismissed.

**B. Interference with ERISA benefits**

Plaintiff claims that, by pressuring him to enter the HIMS program, which put his LTD benefits at risk, United and ALPA interfered with his benefits in violation of ERISA. The applicable section of ERISA provides that it is "unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant [in] or beneficiary" of an ERISA-governed plan "for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan." 29 U.S.C. § 1140.

Defendants argue that Plaintiff's ERISA claim is precluded by the Railway Labor Act ("RLA"), "which governs collective bargaining agreements in the airline industry." *Coker v. Trans World Airlines, Inc.*, 165 F.3d 579, 583 (7th Cir. 1999) (citing *Hawaiian Airlines, Inc. v. Norris*, 512 U.S. 246, 248 (1994)). Under the RLA, "there is a mandatory arbitral mechanism designed to handle disputes 'growing out of grievances or out of the interpretation or application" of CBAs. *Coker*, 165 F.3d at 583 (quoting 45 U.S.C. § 153). If a "dispute may be conclusively resolved by interpreting the existing CBA," *Hawaiian Airlines*, 512 U.S. at 256 (cleaned up), then it is what is known as a "minor dispute," and it "must be arbitrated," not litigated in a federal district court. *Coker*, 165 F.3d at 583. Minor disputes are those that "involve controversies over the meaning of an existing collective bargaining agreement in a particular fact situation." *Hawaiian Airlines*, 512

U.S. at 253. According to Defendants, the LTD plan at issue here is a bargained-for benefit that United provides pursuant to the UPA, and whether Defendants' actions amounted to interference with his rights under the LTD plan depends on whether they violated his rights under the UPA. Therefore, Defendants argue, Plaintiff's ERISA claim must be dismissed as precluded by the RLA.

Plaintiff's ERISA claim appears to sound in Defendants' alleged pressure to enroll in the HIMS program to address his alleged alcoholism, when, according to Plaintiff, the true problem was his head injury, not alcoholism. The Court tends to agree with Defendants that whether they treated Plaintiff properly in these circumstances is a question that arises "'as an incident to the employment relationship,'" which is governed by the UPA. *See Coker v. Transworld Airlines Inc.*, 957 F. Supp. 158, 162 (N.D. Ill. 1997) (quoting *Leu v. Norfolk & W. Ry. Co.*, 820 F.2d 825, 829 (7th Cir. 1987)) (finding ERISA interference claim under § 1140 precluded by RLA). The RLA therefore precludes Plaintiff's ERISA claim. *See Coker*, 957 F. Supp. at 163.

Regardless, dismissal is proper for another reason. Plaintiff alleges that he "ultimately applied for LTD providing all relevant medical information regarding his head injury," and "[f]ull LTD was granted—including back pay." (Am. Compl. ¶ 134.) Then, he asserts, he was terminated, and the benefits ceased. But, for reasons similar to those the Court gave above in connection with the ADA claims, it is not plausible that his termination was motivated by his receipt of ERISA benefits. *See Sturge v. Nw. Airlines, Inc.*, 658 F.3d 832, 840 (8th Cir. 2011). Again, Plaintiff himself alleges that his termination arose out of his failure to complete the HIMS program, and he has not alleged circumstances that would make it plausible, rather than merely possible, that the ERISA benefits were a motivating factor. *See id.*; *see also Runnion ex rel. Runnion v. Girl Scouts of Greater Chicago & Nw. Indiana*, 786 F.3d 510, 526 (7th Cir. 2015) ("A claim for relief must

be plausible rather than merely conceivable or speculative."). Plaintiff fails to state a claim of interference with ERISA-governed benefits under § 1140.

**C. RICO**

The civil RICO statute, 18 U.S.C. § 1964(c), "empowers private parties to bring lawsuits against those engaged in racketeering activity when that activity has caused them harm." *Armada (Singapore) PTE Ltd. v. Amcol Int'l Corp.*, 885 F.3d 1090, 1093 (7th Cir. 2018) (citing *Rotella v. Wood*, 528 U.S. 549, 557 (2000)), *abrogated on other grounds by Yegiazaryan v. Smagin*, 599 U.S. 533, 543-44 (2023). To state a civil RICO claim, a plaintiff must allege "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985); *see Sabrina Roppo v. Travelers Com. Ins. Co.*, 869 F.3d 568, 587-88 (7th Cir. 2017). Congress defined a "pattern of racketeering activity" to require at least two predicate acts of racketeering activity. 18 U.S.C. § 1961(5). "Predicate acts are acts indictable under a specified list of criminal laws, 18 U.S.C. § 1961(1)(B), including mail fraud under 18 U.S.C. § 1341, and wire fraud under 18 U.S.C. § 1343." *Midwest Grinding Co. v. Spitz*, 976 F.2d 1016, 1019 (7th Cir. 1992). Pleading a pattern of racketeering activity requires the plaintiff to "'demonstrate a relationship between the predicate acts as well as a threat of continuing activity.'" *Menzies v. Seyfarth Shaw LLP*, 943 F.3d 328, 337 (7th Cir. 2019) (quoting *DeGuelle v. Camilli*, 664 F.3d 192, 199 (7th Cir. 2011)).

18 U.S.C. § 1962(d) makes it unlawful to conspire to violate the RICO statute. "As with any conspiracy, a RICO conspirator 'must intend to further an endeavor which, if completed, would satisfy all of the elements of a substantive [violation], but it suffices that he adopt the goal of furthering or facilitating the . . . endeavor.'" *Empress Casino Joliet Corp. v. Balmoral Racing Club, Inc.*, 831 F.3d 815, 822-23 (7th Cir. 2016) (quoting *Salinas v. United States*, 522 U.S. 52,

65 (1997)). Therefore, "in order to state a viable claim for conspiracy under § 1962(d), a plaintiff must allege that (1) the defendant agreed to maintain an interest in or control of an enterprise or to participate in the affairs of an enterprise through a pattern of racketeering activity, and (2) the defendant further agreed that someone would commit at least two predicate acts to accomplish those goals." *Slaney v. Int'l Amateur Athletic Fed'n*, 244 F.3d 580, 600 (7th Cir. 2001).

Plaintiff does not state a plausible RICO claim or RICO conspiracy claim. There are numerous pleading problems with the RICO claims, but the most glaring is that, based on Plaintiff's allegations, it is not plausible that Defendants were engaged in a pattern of racketeering activity. A pattern must consist of more than "isolated instances of criminal behavior, not presenting at least some *threat of future harm*." *Gamboa v. Velez*, 457 F.3d 703, 706 (7th Cir. 2006) (emphasis added). Although he makes conclusory suggestions that other pilots have suffered similar treatment, his factual allegations all appear to arise out of his own case, and these allegations do not suffice to establish a pattern for RICO purposes. *See Talbot v. Robert Matthews Distrib. Co.*, 961 F.2d 654, 663 (7th Cir. 1992) (explaining that the plaintiffs failed to sufficiently allege a pattern where they alleged "multiple acts of mail fraud in furtherance of a single scheme—to deprive the plaintiffs of their employment"); *see Lipin Enters. Inc. v. Lee*, 803 F.2d 322, 324 (7th Cir. 1986) (quoting *Sedima*, 473 U.S. at 497) ("RICO is not 'aimed at the isolated offender.'"); *St. John's Hosp. v. Nat'l Guardian Risk Retention Grp., Inc.*, No. 15-CV-3292, 2016 WL 11791899, at *7 (C.D. Ill. June 1, 2016) (explaining that plaintiffs failed to state a RICO claim because "the allegations all concern a single dispute about a single case" (cleaned up)).

The problem is particularly stark to the extent that Plaintiff relies on predicate acts of fraud because, under Rule 9(b), the circumstances constituting fraud must be pleaded with particularity, which means pleading details such as the time, date, and contents of the "allegedly fraudulent

instruments" or communications. *Emery v. Am. Gen. Fin., Inc.*, 134 F.3d 1321, 1323 (7th Cir. 1998); *see Goren v. New Vision Int'l, Inc.*, 156 F.3d 721, 729 (7th Cir. 1998); *Jepson, Inc. v. Makita Corp.*, 34 F.3d 1321, 1328 (7th Cir. 1994). It is not enough to plead simply that Defendants "did the same thing to" others, without giving "names or dates or other details of transactions involving any[one]" else. *Emery v. Am. Gen. Fin., Inc.*, 71 F.3d 1343, 1348 (7th Cir. 1995).

For all these reasons, Plaintiff's allegations do not plausibly "suggest misconduct beyond the bounds of this one" case, now or in the future. *Gamboa*, 457 F.3d at 708. The Court acknowledges that Plaintiff need not plead facts going to every element of his claim. *Runnion*, 786 F.3d at 517. But "his complaint must show 'enough heft' to demonstrate that, if the allegations prove to be true, the pleader is entitled to relief." *Taylor v. Salvation Army Nat'l Corp.*, 110 F.4th 1017, 1028 (7th Cir. 2024) (quoting *Twombly*, 550 U.S. at 557). The requisite "heft" is lacking here. Plaintiff's RICO claims are dismissed.

**D. State-Law Claims and FAA Preemption**

Defendants argue for dismissal of Plaintiff's state-law claims for various reasons. The Court need not delve into them all at this stage: the Court has already explained that all federal claims in this suit must be dismissed, Plaintiff has not alleged that there is diversity of citizenship among the parties; and the Court is not inclined to exercise supplemental jurisdiction over these state-law claims. Nevertheless, because the dismissal will be without prejudice, the Court will address the state-law claims, in hopes of heading off issues that might recur if Plaintiff files a second amended complaint.

Dr. Noven argues that the state-law claims of fraud and intentional interference with a business relationship are implicitly preempted by the Federal Aviation Act, 49 U.S.C. § 40103 *et seq.*, due to that statute's comprehensive regulation of the field of air safety. In these claims,

Plaintiff alleges that Defendants made false statements to the FAA[3] (about his qualifications for a medical certificate, presumably), which resulted in "loss of income, benefits, and professional standing." (Am. Compl. ¶ 149.)

Dr. Noven relies on *Ventress v. Japan Airlines*, 747 F.3d 716, 720 (9th Cir. 2014), in which a flight engineer's state-law claims of retaliatory discharge against his airline employer were preempted by the Federal Aviation Act ("the Act"). The plaintiff claimed that the airline retaliated against him for raising concerns about a pilot's medical fitness for duty by subjecting him to unnecessary psychiatric evaluations. *Id.* at 719-20. The Ninth Circuit explained that the text of the Act and the comprehensive regulations promulgated under it make clear that "Congress intended to have a single, uniform system for regulating aviation safety." *Id.* at 721 (internal quotation marks omitted). The Act and FARs "occup[y] the entire field of aviation safety," and, in particular, "pilot qualifications and medical standards for airmen . . . are pervasively regulated." *Id.* Therefore, the court explained, any state-law claims that amount to "backdoor challenges to [an airline's] safety-related decisions" about flight crew members' medical fitness for duty are preempted. *Id.* Adjudicating the plaintiff's retaliation claims, the court reasoned, would entail an inquiry into whether there were legitimate safety reasons for the airline's actions, and that inquiry would "intrude upon the federally occupied field of pilot safety and qualifications that Congress had reserved" for the FAA. *Id.* at 722 (cleaned up). The Ninth Circuit cautioned that it was not suggesting that the Act preempts all state-law retaliation or whistleblower claims against airlines; it merely held "that federal law preempts state law claims that encroach upon, supplement, or alter

---

[3] Plaintiff also mentions false statements to "Aetna" (Am. Compl. ¶ 148), an entity that is not mentioned by name anywhere else in the complaint. Presumably this refers to the allegation that United falsely reported Plaintiff's withdrawal symptoms. The mention of Aetna does not alter the Court's reasoning.

the federally occupied field of aviation safety and present an obstacle to the accomplishment of Congress' legislative goal to create a single, uniform system of regulating that field." *Id.* at 722-23.

Though it is not binding in this judicial district, the Court finds *Ventress* highly persuasive, and it adopts the Ninth Circuit's approach here. Plaintiff contends that Defendants made false statements to the FAA about Plaintiff's fitness for duty, and adjudicating his claims will require the Court to determine issues such as whether the statements were actually false and unjustifiable, whether the FAA reasonably and justifiably relied on them, and whether the FAA's reliance on them resulted in the harm Plaintiff complains of. As in *Ventress*, Plaintiff is attempting to use state law to mount "backdoor challenges" to certain safety-related decisions that Defendants made with respect to Plaintiff's medical fitness for his duties under FAA regulations. *Id.* at 721; *cf. MaCewen*, 2026 WL 1669698, at *10. Because that would require an inquiry that would "intrude upon the federally occupied field of pilot safety and qualifications that Congress has reserved for the FAA," Plaintiff's claims are preempted. *See Ventress*, 747 F.3d at 722.

Like the Ninth Circuit, the Court emphasizes that this ruling is based narrowly on the facts of this case as alleged by Plaintiff in the operative complaint. The Court makes no sweeping ruling as to when or whether pilots' state-law tort claims against their employers and their associates are preempted by the Act, nor could it. But, as alleged in the operative complaint, Plaintiff's claims are preempted because they are of the sort that encroach upon the federally occupied field of aviation safety.

**E. Fraud and Conspiracy—Failure to State a Claim**

United and Dr. Henry move to dismiss Plaintiff's state-law claims based on various pleading defects, rather than on preemption grounds. Even if the state-law claims were not

preempted, the Court agrees with United and Dr. Henry that Plaintiff fails to state a plausible claim of fraud and conspiracy to commit fraud.

"To prevail on a common law fraud claim in Illinois a plaintiff must prove five elements: (1) a false statement of material fact; (2) known or believed to be false by the person making it; (3) an intent to induce the other party to act; (4) action by the other party in reliance on the truth of the statement; and (5) damage to the other party resulting from such reliance." *Fifth Third Mortg. Co. v. Kaufman*, 934 F.3d 585, 588 (7th Cir. 2019) (cleaned up). The third and fourth elements appear to be missing here because the party to whom the false statements were made and whose action the allegedly fraudulent parties sought to induce is not the party who was allegedly harmed by that action. "A common-law fraud claim requires the *plaintiff*"—not a third-party—"to have relied on the defendant's allegedly false representations." *Sud Fam. Ltd. P'ship v. Otto Baum Co., Inc.*, 237 N.E.3d 1075, 1092 (Ill. App. Ct. 2024) (emphasis added). Plaintiff alleges that Defendants made false statements to the FAA or other third parties with the intent that those parties would rely on them; Plaintiff would always have known the truth, and Defendants could not have reasonably expected *him* to rely on their false statements about him. *See id.*

Additionally, as United and Dr. Henry argue, the fraudulent representations are not alleged with the particularity required by Rule 9(b), or even the more limited factual detail required to state a plausible claim under Rule 8. The details identifying the time, content, sender, recipient, etc., of the fraudulent representations are not sufficiently alleged. The Court gathers that the gravamen of the fraud claim is that Defendants misled the FAA (Am. Compl. ¶¶ 148-150), but not only does the Court fail to see how that amounts to fraud, as explained above, it does not see how Plaintiff was harmed, given that he alleges that he obtained and presently holds an unrestricted first-class medical certificate. (Am. Compl. ¶ 107.) Plaintiff has to "present a story that holds

together," *Swanson v. Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2010), but "the account set forth in the complaint" does not tell "a plausible story" of common-law fraud. It follows that Plaintiff does not state a claim for conspiracy to commit fraud. *Squires-Cannon v. Forest Pres. Dist. of Cook Cnty.*, 897 F.3d 797, 806 (7th Cir. 2018) ("Without an underlying tort, the derivative claims for conspiracy . . . fail."). For all these reasons, Plaintiff fails to state a claim of common-law fraud or conspiracy to commit fraud.

### F. Intentional Interference with Business Relationship—Failure to State a Claim

"The elements of the tort of intentional interference with a business expectancy include (1) a reasonable expectancy of entering into a valid business relationship; (2) the defendant's knowledge of the expectancy; (3) the defendant's intentional and unjustified interference that prevents the realization of the business expectancy; and (4) damages resulting from the interference." *Chicago's Pizza, Inc. v. Chicago's Pizza Franchise Ltd. USA*, 893 N.E.2d 981, 993 (Ill. App. Ct. 2008). Defendants Dr. Noven and Dr. Henry argue that Plaintiff does not state a plausible claim of intentional interference with his employment relationship based on Dr. Henry's report and Dr. Noven's statements to the FAA.

Again, Plaintiff fails to tell a "story that holds together." *Swanson*, 614 F.3d at 404. Dr. Henry and Dr. Noven's participation in the larger HIMS process was relatively limited; Plaintiff has not alleged facts plausibly stating that they played large enough roles in the HIMS process to proximately *cause* the FAA to do anything that harmed Plaintiff. *See Hess v. Kanoski & Assocs.*, 668 F.3d 446, 454 (7th Cir. 2012); *Parson v. Allstate Ins. Co.*, No. 24-CV-1493, 2026 WL 811303, at *7 (N.D. Ill. Mar. 23, 2026); *Hill v. DePaul Univ.*, 2024 IL App (1st) 221568-U, ¶ 51; *cf. Grako v. Bill Walsh Chevrolet-Cadillac, Inc.*, 229 N.E.3d 869, 881 (Ill. App. Ct. 2023). Indeed, as the Court stated above, Plaintiff alleges that he was terminated not strictly because of Dr. Henry or

Dr. Noven's actions but because he refused to complete neuropsychological testing that United demanded. Additionally, he alleges that he currently holds an unrestricted medical certificate, so the Court fails to see how he was damaged, to the extent the claim is that the FAA relied on Dr. Noven and Dr. Henry's statements. *See Cartwright v. Cooney*, 788 F. Supp. 2d 744, 754 (N.D. Ill. 2011); *Int'l Serv. Assocs., Inc. v. Arco Mgmt. of Washington, D.C., Inc.*, No. 94 C 1807, 1994 WL 583302, at *7 (N.D. Ill. Oct. 21, 1994); *see also TAS Distrib. Co. v. Cummins Engine Co.*, 491 F.3d 625, 631 (7th Cir. 2007) ("[I]t is necessary to show damages—not the specific amount, but rather that the plaintiff did, in fact, suffer some damages."). Plaintiff has not alleged sufficient factual matter to state a plausible claim of interference with a business relationship.

The parties raise certain other issues that the Court does not reach, as the foregoing more than suffices to resolve the present motions. For all the above-stated reasons, Defendants' motions to dismiss are granted. Courts should typically give a plaintiff "at least one opportunity to amend [the] complaint," unless "it is certain that amendment would be futile or otherwise unwarranted." *Zimmerman v. Bornick*, 25 F.4th 491, 494 (7th Cir. 2022). The Court cannot say that the complaint "suffer[s] from such obviously incurable defects" that Plaintiff cannot possibly state a claim. *Id.* Therefore, the dismissal is without prejudice and with leave to file a second amended complaint.

**<u>Conclusion</u>**

Defendants' motions to dismiss [48] [51] [52] [73] are granted. The dismissal is without prejudice. Plaintiff may file an amended complaint by 8/27/26. If he files nothing by the 8/27/26 deadline, the Court will dismiss the case without prejudice, on the assumption that Plaintiff no longer wishes to pursue the matter in this Court.

**SO ORDERED.**

**ENTERED: August 10, 2026**

**HON. JORGE L. ALONSO**
**United States District Judge**